# YELLOWSTONE II DEVELOPMENT GROUP, INC., a Montana corporation, Plaintiff and Appellant,

## v.

# FIRST AMERICAN TITLE INSURANCE COMPANY, a California corporation, ELK PARK RANCH, INC., a Montana corporation, and PARK COUNTY, a political subdivision of the State of Montana, Defendants and Respondents.

No. 99-688.
Submitted on Briefs June 1, 2000.
Decided March 6, 2001.
Rehearing Denied April 5, 2001.
2001 MT 41.
304 Mont. 223.
20 P.3d 755.

224

For Appellant: **Stephen C. Pohl**, Bozeman.

For Respondents: **William T. Wagner**, Garlington, Lohn & Robinson, Missoula (Park County); **Michael Dockery**, Crowley, Haughey, Hanson, Toole & Dietrich, Billings (First American); **A. Suzanne Nellen, James A. McLean**, Drysdale, McLean & Nellen, Bozeman (Elk Park Ranch, Inc.).

JUSTICE NELSON delivered the Opinion of the Court.

¶1 Yellowstone II Development Group, Inc. (Yellowstone II), appeals from three separate judgments entered by the Sixth Judicial District Court, Park County, in favor of each Defendant, First American Title Insurance Company (First American), Elk Park Ranch, Inc. (Elk Park), and Park County. Chronologically, the court first denied Yellowstone II's motion for partial summary judgment and entered summary judgment in favor of Elk Park on April 11, 1997; next, the court entered summary judgment in favor of Park County on December 29, 1997; finally, following a bench trial, the court entered a judgment in favor of First American on September 27, 1999.

¶2 We affirm in part, reverse in part, and remand for recalculation of damages.

¶3 Yellowstone raises numerous issues on appeal which we have recast as follows:

1. Did the District Court err in denying Yellowstone II's motion for summary judgment and granting summary judgment in favor of Elk Park?

2. Did the District Court err in granting summary judgment in favor of Park County?

3. Did the District Court err in determining that First American did not breach the title insurance policy issued to Yellowstone II?

4. Did the District Court err in denying Yellowstone II's motion to compel discovery and in granting First American's motion for protective order?

5. Did the District Court err in denying Yellowstone II's motion to amend its complaint?

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 The litigation here, involving Yellowstone II and the three Defendants, arose from the sale and purchase of two sections of property located in Park County, Montana, in July of 1995. The seller in this instance is Elk Park, one of the named Defendants, and the buyer is the Plaintiff, Yellowstone II. The Defendant First American provided title insurance on the property at issue, and Park County

allegedly made negligent misrepresentations concerning the recordability of individual 20-acre tracts within one of the sections of property.

¶5 The two undeveloped sections of property, numbered 20 and 29, are located in the Bangtail Mountain Range, a north-south ridge lying parallel to and east of the Bridger Mountain Range, near the border between Gallatin and Park counties. The parties' agreement, an installment contract for deed, provided that the purchase price of $1,288,800 included a $386,640 down payment due at closing. The parties also drafted and signed a contemporaneous addendum to the main agreement, providing that $186,640 of the down payment would be carried for two months by Elk Park on a promissory note. The transaction closed on July 14, 1995, following the execution of an "Agreement for Sale and Purchase of Real Property," signed by Kelly Meyers, as President of Elk Park Ranch, Inc., on July 1, and David Phillips, as President of Yellowstone II, on July 13. When Yellowstone II defaulted by failing to pay off the note by the due date, September 14, 1995, Elk Park terminated the entire agreement in accordance with the express terms of the addendum.

¶6 Relevant ancillary legal issues have been previously addressed by this Court. *See Elk Park Ranch, Inc. v. Park County* (1997), 282 Mont. 154, 935 P.2d 1131. In that case, this Court determined that Elk Park's attempt to convey 20-acre parcels to itself in March of 1993, using one-party quit-claim deeds, was invalid, pursuant to this Court's decision in *Rocky Mountain Timberlands, Inc. v. Lund* (1994), 265 Mont. 463, 877 P.2d 1018. Although the legal issue of the one-party deeds was essentially the same in both cases, one of the focal issues in *Elk Park* was whether Park County could be estopped from denying the validity of such deeds, and thereby allow Elk Park to convey 20-acre parcels without undertaking subdivision review.[1] This issue was premised on

---

[1] Effective on April 6, 1993, the Legislature amended the Montana Subdivision and Platting Act, §§ 76-3-101 through 625, MCA. The definition of what constitutes a subdivision in the State of Montana was amended from less than 20 acres to less than 160 acres, when parcels are segregated from an original tract. *See generally Elk Park Ranch*, 282 Mont. at 157-58, 935 P.2d at 1133; § 76-3-104, MCA. The one-party deeds at issue in *Elk Park* resulted from an attempt by Elk Park to record several sections worth of separate 20-acre parcels prior to the effective date in 1993. Based on the representation of the then Park County Attorney, Elk Park did not convey the parcels to itself through the use of a "straw man," but instead conveyed individual quit-claim deeds to itself, identifying individual 20-acre parcels. *See Elk Park Ranch*, 282 Mont.

the alleged representations made by county officials indicating that such one-party deeds were valid and could be recorded in March of 1993, as well as the county's apparent acquiescence in initially filing the disputed deeds. This Court held that the doctrine of equitable estoppel was inapplicable in that case.

¶7 The foregoing legal action taken by Elk Park, however, did not commence until November of 1995, two months after it had terminated the sale and purchase agreement at issue here. Our determination of the legal effect of certain representations made by county officials in that case are nevertheless germane because Yellowstone II allegedly relied on many of the same representations that were made by the county to Elk Park.

¶8 Thus, at the time the contract was entered in July of 1995, whether a subsequent buyer of the whole section could avoid subdivision review in the event the buyer chose to sell and separately deed some or all of the individual 20-acre tracts identified in Elk Park's quit-claim deeds was far from a legal certainty. It is undisputed, however, that this contingency was thoroughly discussed between the bargaining parties, and that, at best, the county's position at the time was irresolute. For example, in May of 1995, Park County informed Elk Park that it would not "transfer any of these above described property [which included section 20] as separate parcels unless they undergo subdivision review." This information was shared with Yellowstone II. Further, it is undisputed that the warranty deed at issue here was not presented to the county at any time for recording, or merely for determining whether it was, in the eyes of county officials, recordable. At a meeting in late August or early September of 1995, however, Phillips was informed by the county that it would in fact seek an Attorney General Opinion regarding whether the county would be estopped from recording Elk Park's one-party deeds as well as deeds resulting from Yellowstone II's subsequent sale of individual 20-acre parcels. It is undisputed that Phillips also discussed subdivision review at that time, and as a result of this discussion decided "there was no way I could put it [section 20] through subdivision" due to a number of complications. At various times throughout the course of this litigation, however, Yellowstone II has alleged that it purchased what it believed was an existing subdivision.

¶9 Furthermore, Phillips was certainly no stranger to such

at 159, 935 P.2d at 1134.

transactions. He would testify that he was a Realtor licensed in Colorado and possessed extensive experience in similar real estate development deals in Colorado. He further stated that he had the opportunity to review and negotiate the terms of the sale and purchase agreement, and that he had studied Montana's subdivision laws prior to entertaining the transaction at issue here. He testified that he in fact had been involved in a land deal in Colorado where a new regulation was passed requiring the project to unexpectedly undergo subdivision review, which caused delays and added costs. Nevertheless, Phillips maintained that sufficient assurances were made to him concerning the estoppel effect of the county's prior representations, as well as adequate coverage under the title insurance policy, for him to go forward with the deal.

¶10 Elk Park executed one warranty deed conveying the subject real property to Yellowstone II on the closing date. Under the agreement's heading *"Warranty Deed,"* Elk Park agreed that simultaneously with the execution of the agreement it would "execute a good and sufficient Warranty Deed, regular on its face, suitable for recording...." The provision further provided that the title to the real property would be "free and clear of liens and encumbrances. . . ." Pursuant to the terms of the agreement, the deed was deposited with an escrow agent with instructions that the agent would deliver the warranty deed to Yellowstone II upon receipt of full payment of the purchase price, which was set at June 1, 2000. A quit claim deed conveying all interest from Yellowstone II back to Elk Park was also deposited with the escrow agent, in the event Yellowstone II defaulted as provided under the agreement.

¶11 Under the terms of the agreement, Elk Park acknowledged receipt of $50,000 in earnest money prior to the agreement being executed pursuant to an initial buy-sell agreement signed June 12, 1995. Elk Park received an additional $150,000 from Yellowstone II at closing, with the $186,640 balance of the $386,640 down payment due under the promissory note. The addendum to the agreement provided:

> In the event said Promissory Note is not paid in full together with interest thereon on the due date set forth above, the original agreement shall terminate, be at an end and of no further force and effect and seller shall be under no further or other obligation to convey the real property described therein to Buyer ....

The addendum did not provide any notice or cure provision, or any other means by which Yellowstone II could forestall default. The note was due in full on September 14, 1995. The remaining balance of

$902,160 would then be paid by Yellowstone II in quarterly installment payments of $26,000, with the first due on October 1, 1995, culminating with a balloon payment on June 1, 2000.

¶12 In contrast, under the heading *"Default"* in the main agreement, the parties agreed that "THE TIMELY PAYMENT OF THE INSTALLMENTS UPON THE UNPAID BALANCE OF THE PURCHASE PRICE HEREINABOVE SET FORTH IS THE ESSENCE OF THIS AGREEMENT ...." This provision provided that if Yellowstone II failed to make "any one *installment* of principal and interest due, Seller may at Seller's option, serve written notice upon Buyer demanding payment of the amount then past due and owing." (Emphasis added). What then followed in the agreement was a notice-and-cure period totaling 60 days, including an acceleration clause, at the end of which Elk Park, if Yellowstone had failed to cure, could retake possession. The default provision also provided that if Yellowstone II failed to cure after receiving the second notice "all payments theretofore paid shall be construed as liquidated damages and reasonable rental for the use of the premises, and improvement thereon, if any there be, which improvement shall merge with the real property and be forfeited unto the Seller as liquidated damages for the breach of this Agreement."

¶13 Several other terms of the sale and purchase agreement are relevant to the discussion here. For example, in the preamble, the agreement refers to "that certain *parcel* of real property" and identifies "Exhibit A," which is attached to the agreement, for a more particular description. Exhibit A provides a "legal description" of the property extracted from a preliminary title report:

*Legal Description*

Township 1 North, Range 8 East, M.P.M., Park County, Montana
Section 20: Government Lots 1, 2, 3, 4,

E½SE¼NE¼, W½SE¼NE¼, E½SW¼NE¼

....

[similarly identifies 21 other tracts]

Section 29: NE¼, NW¼, SW¼, SE¼

In turn, Exhibit B, referred to as the "preliminary title report" or "title commitment," identifies two parcels, Parcel I, and Parcel II, which bear the same description as sections 20 and 29 in Exhibit A. The Buyer's Closing Statement, prepared by the escrow company, also refers to the property as "Section 29 " and "Section 20." It is undisputed that during the negotiations, Yellowstone II's president, Phillips, requested that the legal description specifically include the

identification of the individual lots, rather than as whole sections only. ¶14 Further, the agreement provided that Yellowstone II warranted that it had received the preliminary title commitment, and that "Buyer is knowledgeable with regard to the contents thereof, or has had the opportunity to become knowledgeable by seeking competent advice with regard to the same." The agreement also provided that Yellowstone II had 14 days after the receipt of the preliminary title commitment to "object to any exceptions to the title to the real property described in Exhibit 'A'." This provision then provided that if Yellowstone II wished to raise an objection to any exception in the preliminary title commitment or the title insurance policy, its sole remedy "shall be obtained from Security Title Company of Park County and not Seller, and any such after closing objection shall not relieve Buyer from paying and performing each and every one and all of the terms, covenants and conditions of this Agreement."

¶15 It is further undisputed that the title insurance policy commitment initially identified the problem of "recordability and acceptance of documents conveying title for Parcel I by the Clerk and Recorder, Park County, Montana," apparently meaning the title policy would not be issued until this problem had been resolved. Testimony would indicate that this exception was included because there was a question about the validity of the 20-acre tracts that had been created in the Elk Park Ranch one-party deeds.

¶16 Consequently, Elk Park presented Security Title (which issued the First American policy) with an affidavit from a former Park County Attorney, attesting to his opinion given to Elk Park in March of 1993, that there were "no legal impediments" to recording a quit claim deed describing the individual parcels. Based on this affidavit, which has subsequently been characterized by the county as "misadvice," the county officials, when asked, allegedly did not disavow that they may be estopped in the future from denying the validity of the Elk Park deeds. Subsequently, the recordability exception was removed, and the policy was issued at closing.

¶17 Yellowstone II would later allege that this action taken by Security Title led its president, Phillips, to believe that the First American policy would insure Yellowstone II in the event that the representation by Park County was wrong, and 20-acre parcels could not be sold without subdivision review. Agents for Security Title and First American have claimed that the plain language of the policy offers no indication of such coverage, and that no representation of this was made to Yellowstone II at any time.

¶18 The agreement also provided that Elk Park would execute a notice of purchaser's interest, which could then be recorded by Yellowstone II. It is undisputed that this notice was accepted by the county. Elk Park also agreed that it had "made a full and complete disclosure of all pertinent data, information, and knowledge which Seller might reasonably be in possession of pertaining to the real property ..." and that Elk Park made "no other warranties, expressed or implied, of any type or nature, excepting the warranties appurtenant to the warranty deed conveying title to the real property described in Exhibit 'A'." In turn, Yellowstone II warranted that it had "viewed the real property which is the subject of this Agreement, is knowledgeable, or has had an opportunity to become knowledgeable by seeking competent advice with regard to the premises, and is not relying on any representation of any type or nature made by Seller or Seller's agent, if any there be."

¶19 Finally, the agreement provided that Elk Park gave Yellowstone II the "right and option to release portions of the real property ... prior to the payment of the total purchase price ..." for $1,050 per acre, which would be credited against the unpaid balance. Other than this provision, the agreement is silent as to the intended purpose of Yellowstone II's purchase of the two sections of land, or any assurances or conditions pertaining to the suitability of the property for resale, or any contingencies that might arise due to the alleged representations of Park County officials regarding recording, or the likelihood of subdivision review.

¶20 Elk Park presented a notice of termination to Yellowstone II on September 15, 1995, one day after Yellowstone II failed to pay off the promissory note. The notice did not mention the $200,000 down payment; rather, it informed Yellowstone II that it would take immediate repossession of the two sections. On October 2, 1995, Yellowstone II by letter requested a rescission from Elk Park and a return of its down payment, a request that was refused by Elk Park.

¶21 Yellowstone II filed suit on May 16, 1996. Under the first count, it claimed a right to rescission of the sale and purchase agreement based on a material failure of consideration, in that the warranty deed executed by Elk Park was not "suitable for recording" and was therefore unmarketable. Yellowstone II did not allege that its right to rescission was based on fraud, or constructive fraud, due to any representations made by Elk Park prior to entering the sale and purchase agreement. It claimed a right to its $200,000 down payment and damages. Under the second count, Yellowstone II claimed under the theory of quantum meruit that Elk Park had been unjustly

enriched as a result of the transaction, in that it benefitted from improvements to the property made by Yellowstone II.

¶22 Under count three, Yellowstone II claimed that Park County had negligently misrepresented information to Elk Park and its agents and counsel, which Yellowstone II had in turn relied upon in entering and executing the agreement.

¶23 Under count four, Yellowstone II claimed that First American had breached its title insurance contract when it refused to litigate or compensate Yellowstone II for its losses sustained as a result of the "unrecordability and unmarketability of the title to the property obtained from Elk Park." Yellowstone II also claimed that First American violated the Unfair Trade Practices Act by not settling its claim. It is undisputed that Yellowstone II filed a claim with First American, under its title insurance policy, on September 12, 1995, prior to termination of the agreement by Elk Park.

¶24 Elk Park counterclaimed on July 19, 1996, claiming that due to Yellowstone II's breach, Elk Park was entitled to the full payment of the promissory note. Yellowstone II moved for partial summary judgment on August 7, 1996, which was followed by Elk Park's motion for summary judgment.

¶25 The court denied Yellowstone II's motion for partial summary judgment and entered summary judgment in favor of Elk Park on April 11, 1997. The court found that it was undisputed that prior to the execution of the buy-sell agreement, Elk Park gave full disclosure of the prior one-party deeds, and advised Yellowstone II of the issues regarding the question of whether the future sales of separate 20-acre parcels would be allowed by Park County. Further, the court found that there were no representations made by Elk Park to Yellowstone II that the 20-acre tracts described in Section 20 could be sold separately without going through subdivision review, nor was such a contingency reflected in the parties' agreement.

¶26 The court concluded that, in light of the undisputed facts, the warranty deed executed by Elk Park was sufficient to convey valid, marketable title, and was suitable for recording; a mutual mistake did not occur between the parties and the consideration of the agreement did not fail; Yellowstone II was not entitled to a rescission of the agreement and a refund of the down payment; and, Elk Park was entitled to summary judgment on its counterclaim. Thereafter, the court denied Yellowstone II's motion to leave to amend its original complaint on February 4, 1998.

¶27 Park County moved for summary judgment on July 31, 1997. The

court entered summary judgment in favor of the county on December 29, 1997. The court briefly stated that Yellowstone II "was aware from the beginning that the proposed subdivision was flawed because of the void deeds, and even admitted that if forced to do so it would comply."

¶28 As for the action between Yellowstone II and First American, the District Court summarily denied Yellowstone II's motion to compel, granted First American's motion for protective order, and denied both parties' motions for summary judgment on October 30, 1998.

¶29 The bench trial between these two remaining parties was held on June 9 and 10, 1999. At that time, Yellowstone II stipulated to try its breach of contract claim first, and in the event it prevailed on the issue of liability, it would then try the issues of damages and bad faith in a second trial at a later date. The court entered a judgment in favor of First American on September 27, 1999. The court concluded that upon reading the title insurance policy as a whole, "it is clear that the policy did not extend coverage to insure any prior or future subdivision of Section 20 or 29 " and therefore Yellowstone II's claims were without merit. The court observed that based on the evidence, the title to sections 20 and 29 were marketable in that there was access to and from the land, and there were no defects, liens or encumbrances on the title. The court further concluded that the ineffectiveness of an earlier attempt to subdivide the property "did not affect the marketability of the property—only the market value of the property and the resulting need to comply with the Montana Subdivision and Platting Act in the event of future subdivision of the land."

¶30 Yellowstone II appeals the three respective judgments, and also claims that the court erred when it denied its motion to compel discovery of First American's claim files, and further erred when it granted First American's motion for a protective order.

## STANDARDS OF REVIEW

¶31 This Court reviews an order granting summary judgment *de novo*, using the same Rule 56, M.R.Civ.P., criteria applied by the district court. *See Spinler v. Allen*, 1999 MT 160, ¶ 14, 295 Mont. 139, ¶ 14, 983 P.2d 348, ¶ 14. This Court looks to the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits to determine the existence or nonexistence of a genuine issue of material fact. *See Erker v. Kester*, 1999 MT 231, ¶ 17, 296 Mont. 123, ¶ 17, 988 P.2d 1221, ¶ 17.

¶32 Summary judgment is an extreme remedy which should be granted only when there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

*See* Rule 56(c), M.R.Civ.P., *Spinler*, ¶ 16. The party seeking summary judgment, therefore, has the burden of demonstrating a complete absence of any genuine factual issues. *See Spinler*, ¶ 15. The party seeking summary judgment also must overcome the burden that all reasonable inferences that might be drawn from the offered evidence will be drawn in favor of the party opposing summary judgment. *See Erker*, ¶ 17.

¶33 Where the moving party is able to demonstrate that no genuine issue as to any material fact remains in dispute, however, the burden shifts to the party opposing the motion. *See Spinler*, ¶ 15. This burden shift requires that the opposing party present material and substantial evidence, rather than merely conclusory or speculative statements, to raise a genuine issue of material fact. *See Erker*, ¶ 17.

¶34 This Court reviews the findings of a trial court sitting without a jury to determine if the court's findings are clearly erroneous. *See Norwood v. Service Distributing, Inc.*, 2000 MT 4, ¶ 21, 297 Mont. 473, ¶ 21, 994 P.2d 25, ¶ 21. A district court's findings are clearly erroneous if they are not supported by substantial credible evidence, if the trial court has misapprehended the effect of the evidence, or if a review of the record leaves this Court with the definite and firm conviction that a mistake has been committed. *See Norwood*, ¶ 21 (citation omitted). Additionally, in determining whether the trial court's findings are supported by substantial credible evidence, this Court must view the evidence in the light most favorable to the prevailing party. *See Norwood*, ¶ 21 (citation omitted). We review a district court's conclusions of law to determine whether those conclusions are correct. *See Norwood*, ¶ 22 (citation omitted).

### DISCUSSION

¶35 As a preliminary matter, we observe that the District Court, in its first order adjudicating the matter between Yellowstone II and Elk Park, concluded that "[t]he documents and deeds in this case are not ambiguous and therefore the Court will not consider parol evidence." Determining whether a term in a contract is ambiguous–i.e., subject to more than one reasonable meaning in view of the contract as a whole–is not a question involving parol evidence, but merely one of law concerning interpretation and potential use of extrinsic evidence. *See In re Marriage of Holloway*, 2000 MT 104, ¶ 5, 299 Mont. 291, ¶ 5, 999 P.2d 980, ¶ 5; § 1-4-102, MCA (providing that in construing contract judge should be placed in the position of those whose language he or

she is to interpret).[2] We agree, however, with the court's ultimate determination, as well as Yellowstone II's concession, that the sale and purchase documents at issue do not present any ambiguities relevant to the issues presented here.

¶36 Nevertheless, parol evidence abounds in the briefs and in the record before this Court due to the inherent complications presented by a matter involving three defendants, two of whom are not parties to the contract, and three separate judgments entered over a course of more than two years. While we may properly consider evidence of the circumstances under which the agreement was made, *see, e.g., Weinberg v. Farmers State Bank of Worden* (1988), 231 Mont. 10, 24, 752 P.2d 719, 728; § 28-2-905, MCA, we will not consider evidence presented for the singular purpose of establishing that a contract includes supplemental promises or mutual understandings or conditions of performance that were never incorporated into a written agreement that by its own terms purports to represent the entire agreement between the parties. *See* § 28-2-904, MCA (providing that the execution of a contract in writing supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument). *See also* § 70-20-202, MCA (providing rules regarding extrinsic evidence in construing deeds).

¶37 Suffice to say, this Court must therefore disregard all attempts by Yellowstone II to establish that, in addition to the express, unambiguous terms of the written agreement, the "contract" should include additional parol promises or representations or mutual understandings allegedly made by the parties prior to and at the time of formation concerning whether section 20 had been subdivided, or would be deemed so by Park County, or would be suitable for immediate resale by Yellowstone II in 20-acre lots. We also observe that neither party has asserted that any additional agreements or modifications were made subsequent to formation.

¶38 Therefore, disregarding all alleged prior negotiations, it is undisputed that within the four-corners of the agreement between the parties there is no indication that the immediate resale of 20-acre parcels, based on representations made by Park County concerning

---

[2] For an insightful discussion of the parol evidence rule in Montana, *see* Scott J. Burnham, *The Parol Evidence Rule: Don't be Afraid of the Dark*, 55 Mont.L.Rev. 93 (1994).

recordability, was a basis of the bargain. Likewise, there is no indication that the immediate acceptance by the county of 20-acre deeds was a condition precedent of the payment on the promissory note. *See State v. Frederick* (1984), 208 Mont. 112, 115-16, 676 P.2d 213, 215 (parol evidence of supplemental agreement following formation allowed where contract stipulated that payment could be determined by a later mutual agreement).

¶39 The contract here merely provided that Elk Park agreed to "release portions of the real property ... prior to the payment of the total purchase price" and if Yellowstone II wished to exercise this right it must furnish Elk Park with a "Warranty Deed, regular on its face, describing therein the real property proposed for release." Aside from the foregoing, the agreement was silent as to any potential resale of the property, or the likelihood of subdivision review, or any other contingencies that might arise regarding recording.

¶40 Further, the agreement itself recited a comprehensive integration provision, including the following language:

[T]his Agreement constitutes the entire Agreement and understanding by and between the parties .... and supersedes all prior and/or contemporaneous oral or written agreements and understandings of the parties .... In this connection, no assertion, allegation, representation, covenant, or condition not expressed in the Agreement shall affect, or be effective, to interpret the intent of the parties, modify or change this Agreement, or restrict the expressed provisions contained herein.

We agree, therefore, with the District Court that the contract between the parties did not warrant or otherwise represent that Elk Park was selling a subdivision or that Yellowstone II could in turn immediately sell any portion of the two parcels without first going through subdivision review.

¶41 Thus, we conclude that all understandings or negotiations as to the respective obligations of Yellowstone II and Elk Park made prior to and at the time of formation shall be disregarded to the extent that they are presented as parol evidence.

### Issue 1.

*Did the District Court err in denying Yellowstone II's motion for summary judgment and granting summary judgment in favor of Elk Park?*

¶42 Yellowstone II contends that based on either the theory of mutual mistake or failure of consideration, it should be entitled to rescind the

sale and purchase agreement with Elk Park, and, as a further remedy, be entitled to the full return of its down payment.

¶43 Yellowstone II claims that its right to rescind arose when it learned that it could not, as allegedly contemplated by the agreement, immediately resell and record individual 20-acre lots due to what it describes as a reversal of position by Park County officials in August or September of 1995, when Yellowstone II was informed that the county would seek an Attorney General Opinion concerning whether it was estopped from denying the validity of Elk Park's one-party deeds. According to Yellowstone II, the immediate resale of 20-acre parcels was the "fundamental purpose" of the contract, and that it lost several such deals that were underway at the time of its default.

¶44 Thus, according to Yellowstone II, the warranty deed executed by Elk Park was not "suitable for recording" and the title to the property was not "marketable" as contemplated by the parties' agreement once Park County allegedly changed its position, and informed Yellowstone II that most likely the transfer of individual lots located in section 20 would not be valid without subdivision review.

¶45 Yellowstone II argues, therefore, that the District Court erred when it denied Yellowstone II's motion for partial summary judgment on this issue, and in turn erred by granting summary judgment on April 11, 1997, in favor of Elk Park on its counterclaim, which required that Yellowstone II pay in full the $186,640 plus interest due under the promissory note.

¶46 The issue of rescission here offers several novel twists on the ordinary course of contractual relations—ones that necessitate a fairly lengthy discussion.

¶47 As a starting point, we observe the undisputed fact that Yellowstone II requested a rescission from Elk Park on October 2, 1995, and brought suit for rescission on May 16, 1996. As with any claim for rescission, Yellowstone II no longer wished to perform due to Elk Park's alleged material failure to perform, and sought to have the agreement extinguished. *See* § 28-2-1701(2), MCA. No further performance was due on the part of Yellowstone II, however, because the contract had been terminated by Elk Park on September 15, 1995. Curiously, Yellowstone II has not argued that Elk Park's termination was invalid, as a matter of law, and therefore the contract remained in force when it demanded rescission.

¶48 In turn, Elk Park eventually counterclaimed that, although it had terminated the contract and acquired repossession of both sections of property, it was entitled to not only retain the $200,000 down payment

but also, in effect, demand Yellowstone II's continued performance, requiring it to pay the $186,640 plus interest due on the promissory note as well as unspecified damages for what it claimed was Yellowstone II's material breach.

¶49 Thus, both parties mutually eyed the same favorable result. Neither wished to remain contractually obligated to the other. At least the parties agreed on this much. We therefore conclude that there are no material facts in dispute that on September 15, 1995, Elk Park properly exercised its contractual right to terminate the agreement due to Yellowstone II's default.

¶50 It is further undisputed that Yellowstone II took no affirmative step prior to its default to give notice, or assert a claim, or otherwise inform Elk Park that it wished to rescind or renegotiate the agreement. *See, e.g.*, § 28-2-1713, MCA (rescinding party must use reasonable diligence to rescind promptly upon discovering the facts which entitle him to rescind). Although Yellowstone II does not squarely address the issue raised by Elk Park–of if and when equity permits a party in default to rescind a previously terminated contract–it nevertheless addresses the viable issue that Elk Park may have been, in fact, the first party to breach in this instance.

¶51 We agree with Yellowstone II that ordinarily if one of the contracting parties materially breaches the contract, the injured party is entitled to unilaterally suspend his performance. *See Liddle v. Petty* (1991), 249 Mont. 442, 446, 816 P.2d 1066, 1068. One potential right available to the non-breaching party, under such circumstances, pursuant to § 28-2-1711, MCA, is rescission. *See Norwood v. Service Dist., Inc.,* 2000 MT 4, ¶¶ 29-33, 297 Mont. 473, ¶¶ 29-33, 994 P.2d 25, ¶¶ 29-33 (discussing failure of consideration as ground for rescission). These rules would seemingly support Yellowstone II's contention that its failure to pay off the promissory note on September 14, 1995, and then demand rescission was proper due to Elk Park's prior material breach–in not conveying marketable title or a deed suitable for recording–notwithstanding that the agreement was terminated first by Elk Park.

¶52 ■ Indeed, it is a well-settled general rule in Montana that a seller of real estate cannot enforce a forfeiture provision in a contract for deed if it has materially failed to perform a condition concurrent or precedent to the buyer's obligation to perform. *See generally Wise v. Sebena* (1991), 248 Mont. 32, 37, 808 P.2d 494, 497-98 (discussing rule that a buyer's performance may be excused where seller fails to convey

marketable title). The established rule of law is that a vendor cannot, while unable to tender good title, enforce a forfeiture provision of a contract on default of the vendee. *See Turner v. Ferrin* (1988), 232 Mont. 146, 155, 757 P.2d 335, 340.

¶53 In light of the foregoing, it is undisputed here that Elk Park agreed to *"simultaneously with the execution of this Agreement ...* execute a good and sufficient Warranty Deed, regular on its face, suitable for recording ..."* that would convey to Yellowstone II title to the real property "which is the subject of this Agreement, free and clear of liens and encumbrances ...."[3] (Emphasis added). The clear, express terms of the contract distinguish the facts here from the general rule that under an installment contract, the seller need not produce marketable title until the buyer has fully performed. *See Liddle*, 249 Mont. at 446, 816 P.2d at 1068 (stating that unless the contract provides otherwise, "the general rule is that the vendor need not produce marketable title to real property sold under an installment contract until the date set for final payment and tender of the deed"). Thus, Elk Park had an obligation to perform no later than July 14, 1995, an obligation that, if materially breached, could arguably excuse Yellowstone II's future performance under the contract, and potentially sustain an action for its unilateral rescission.

¶54 Although we have managed to unearth from Yellowstone II's voluminous allegations the bare assertion that Elk Park did in fact materially breach the contract, the evidence to support this contention is far more scarce.

¶55 To the contrary, Yellowstone II has focused this Court's attention squarely on Park County's alleged reversal of its position in August or

---

[3] As Elk Park correctly points out, the agreement contained an exclusive remedy provision requiring Yellowstone II to object within 14 days of closing to any "exception contained in the preliminary title commitment and/or the title insurance policy" and, if so, avail itself exclusively to a title insurance claim for any damages. Pursuant to § 33-25-111, MCA, however, the condition of the title cannot necessarily be gleaned from either a preliminary report or a title insurance policy, and any "exceptions" found therein. Further, the "exceptions" referred to under the preliminary title commitment and the title policy merely identify possible existing easements, boundary lines, mineral interests, and liens that are not of public record. Thus, any objections to "exceptions" found in the preliminary title report or the First American policy would not necessarily function as viable means for Yellowstone II to object to the marketability of the title itself or the recordability of the deed, and thus its claim against Elk Park cannot be barred by this provision.

September of 1995, regarding the recordability of individual parcels located within section 20–a contingency that was clearly within the knowledge and contemplation of the parties as early as May of that year, but was never expressed in any manner whatsoever in their subsequent agreement. It was this independent event–one which was certainly not caused in any manner by Elk Park's promised performance under the express provisions of the agreement–that may have caused Elk Park's performance to "fail," or may have revealed that a mutual mistake existed between the parties at the time of formation.

¶56 Yellowstone II, however, has not asserted it should be excused from performance under the doctrine of frustration or impossibility, or any other similar theory where an event not caused by a party to the contract renders performance impractical or impossible. *See, e.g., 360 Ranch Corp. v. R & D Holding* (1996), 278 Mont. 487, 493, 926 P.2d 260, 263-64 (concluding that due to Bozeman-area planning documents and ensuing delay, it was impossible for ranch to file subdivision plat within one-year time period specified in option agreement). *See also* Restatement (Second) of Contracts § 261 (stating that where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary).

¶57 Further, Yellowstone II's assertion of mutual mistake–which likewise does not address any material breach by Elk Park–cannot be sustained, as a matter of law, because a mutual mistake occurs when, at the time the contract is made, the parties share a common misconception about a vital fact upon which they based their bargain. *See Mitchell v. Boyer* (1989), 237 Mont. 434, 437, 774 P.2d 384, 386 (concluding that mutual mistake was made where real estate agent was never informed of restrictions on property placed in earlier deeds, did not "discover the truth" until after the transaction was consummated, and buyers assumed agent's representations were accurate and truthful) (citations omitted).

¶58 Applying the rule in *Mitchell* to the circumstances here, and in the light of our prior ruling concerning parol evidence, the parties clearly based their bargain not on a mutually understood material fact; rather, the parties based their bargain on a mutually understood uncertainty, or a proverbial pig in a poke.

¶59 We conclude, therefore, that the parties' belief that Park County

officials had opined or had given their word that they would be estopped and therefore accept 20-acre deeds was not a material fact at the time of formation. It is a maxim of our jurisprudence, after all, that the law deems certain only that which can be made certain. *See* § 1-3-229, MCA. The undisputed facts reveal that both parties, although upset and perhaps surprised that the county would not record 20-acre deeds, had actual knowledge at the time of formation that the future recording of such 20-acre parcels may not be valid. *See generally Goodman Realty, Inc. v. Monson* (1994), 267 Mont. 228, 232, 883 P.2d 121, 124 (doctrine of mutual mistake inapplicable where plaintiff has actual knowledge of mistake).

¶60 Therefore, pursuant to our *de novo* review, we agree with the District Court that no material facts are in dispute concerning whether Elk Park's performance conformed to its promises expressed in the sale and purchase agreement. Aside from Yellowstone II's speculative and conclusory assertions regarding the nature of the legal description expressed in Elk Park's warranty deed, it is undisputed that the deed for the two sections was in fact recordable as such. It is undisputed, for example, that the quit claim deed held in escrow, bearing the identical legal description, was promptly recorded by Elk Park without incident, and that the testimony offered by a Park County Attorney indicated that, as a warranty deed conveying two sections of land, it was recordable. Again, the agreement generally called for a warranty deed suitable for recording, not suitable for recording as a subdivision.

¶61 Further, it is undisputed that, at the time of closing, the title to this property was free from encumbrances or liens or other defects that could legally call into question its "marketability," as that term has been defined in our case law. *See, e.g., First Montana Title Co. of Billings v. North Point Square Ass'n* (1989), 240 Mont. 33, 37-38, 782 P.2d 376, 379. Aside from recordability, Yellowstone II presents no evidence of any encumbrances of any kind, or evidence that a buyer would be forced to bring a quiet title action or other litigation to clear title to the two sections. *See, e.g., McCarthy v. Timberland Resources, Inc.* (1985), 219 Mont. 278, 712 P.2d 1292 (buyer entitled to rescind where county refused to record due to alleged defect in property description that seller failed to correct). *See also* D. Barlow Burke, Jr., Law of Title Insurance § 3.2.6 (2d ed. 1993) (explaining general rule that requirements of subdivision map or plat act do not affect "marketability" of title). Nothing would have prevented Yellowstone II, for example, from immediately reselling the whole, or one of the two

sections, or a parcel of 160 acres or more, to another willing buyer. *See* 77 Am.Jur.2d *Vendor and Purchaser* § 138 (explaining reasonable buyer test for evaluating marketability).

¶62 We conclude, therefore, that without a material breach on the part of Elk Park, Yellowstone II was obligated to continue performing. Thus, we must apply the rule that a party seeking rescission cannot, itself, be in default of the contract. *See Polich Trading Co. v. Billings Hudson Terraplane Co.* (1943), 114 Mont. 446, 450, 137 P.2d 661, 663. *See also Moschelle v. Hulse* (1980), 190 Mont. 532, 541, 622 P.2d 155, 160 (indicating that a purchaser in default may rescind where vendor commits fraud, and noting that when the vendees gave notice of rescission, they were still within the grace period permitted by the express terms of the contract for curing default payments).

¶63 ■ Accordingly, we hold that under the specific circumstances described here, where Elk Park, as the seller under a contract for deed, did not materially breach the contract, Yellowstone II, as the buyer in default, cannot enforce rescission subsequent to the legal termination of the agreement. Thus, to the extent that the District Court recognized that Yellowstone II's subsequent claimed entitlement to rescission was rendered moot and without merit by Elk Park's lawful termination, we affirm the judgment in favor of Elk Park.

¶64 What remains at issue, therefore, is a legal determination of what tangible sum or interest each party should be entitled to take away from this extinguished deal, as each party goes its separate way.

¶65 It is undisputed that after Elk Park terminated the agreement and Yellowstone II demanded a rescission, Elk Park refused to return the $200,000 down payment it had already received.[4] This led to Yellowstone II filing suit in May of 1996, seeking rescission and the return of its down payment. In August of 1996, Elk Park asserted a right to damages for breach of the terminated agreement. Pursuant to its counterclaim, which also named Yellowstone II's president David Phillips individually as a third-party defendant, Elk Park apparently believed that it was entitled to retain not only the $200,000 down

---

[4] It is undisputed that $50,000 of the $200,000 received by Elk Park was earnest money tendered by Yellowstone II on June 6, 1995, pursuant to a "Buy/Sell Agreement and Earnest Money Deposit Receipt." This agreement did not, however, expressly provide that Elk Park could retain any of the earnest money in the event the sale did not occur. Likewise, the sale and purchase agreement executed in July did not address this contingency.

payment, but further entitled to collect the remaining $186,640 of the down payment due under the promissory note, as well as further, unspecified damages for Yellowstone II's breach. Elk Park has not advanced any theory at law or equity as to why it should be entitled to any of these sums.

¶66 Thus, when the District Court granted summary judgment in favor of Elk Park, it not only denied Yellowstone II's rescission claim, but determined that Elk Park was entitled to a $386,640 windfall without providing an underlying legal rationale. Under the District Court's judgment, Elk Park would reap this benefit for a mere three months of possession by Yellowstone II. Although failing to squarely assert a claim for restitution, Yellowstone II is nevertheless justified in asserting that something is indeed amiss. We agree.

¶67 ■ First, we conclude that Elk Park's claim that Yellowstone II, in effect, must continue to perform under a terminated agreement cannot be sustained as a matter of law. Elk Park has not advanced any plausible theory as to why it may require Yellowstone II's continued performance under a terminated contract, which expressly provided that the subject property immediately would be quit-claimed to Elk Park in the event of default. It is a well-settled elementary legal principle, after all, that "the law does not give something for nothing." See *Kirk v. Smith* (1914), 48 Mont. 489, 493, 138 P. 1088, 1089. To this extent, we hold that the District Court erred, as a matter of law, when it entered judgment in favor of Elk Park's claim that it may enforce the $186,640-plus-interest obligation due under the promissory note.

¶68 Next, the addendum to the main agreement, which governed the rights and obligations of the parties regarding the promissory note, provided that the terms of the "down payment" would be amended, and that:

> In the event said Promissory Note is not paid in full together with interest thereon on the due date set forth above, the original agreement shall terminate, be at an end and of no further force and effect and Seller shall be under no further or other obligation to convey the real property described therein to Buyer ....

The original agreement provides that the $50,000 earnest money along with $336,640 due at closing constituted the *down payment*. The balance of the purchase price, $902,160, would be paid in what the agreement identifies as "quarterly *installment payments*" of $26,000. In turn, under the provision entitled *"Default"* in the original agreement, the parties agreed that "THE TIMELY PAYMENT OF THE *INSTALLMENTS* UPON THE UNPAID BALANCE OF THE

PURCHASE PRICE ... IS THE ESSENCE OF THIS AGREEMENT, and if Buyer fails to make any one *installment* of principal and interest when due, Seller may, at Seller's option, serve written notice upon Buyer demanding the payment of the amount then past due and owing." (Emphasis added).

¶69 The agreement then provides what amounts to a 60-day notice and cure period, with an acceleration clause, which starkly contrasts to the no-cure provision governing payment of the down payment under the promissory note. Then, in the event the buyer did not cure following receipt of a second notice, the agreement would "terminate, be at an end and of no further force and effect ... and that all payments theretofore paid shall be construed as liquidated damages and reasonable rental for the use of the premises, and improvements thereon, if any there be which improvement shall merge with the real property and be forfeited unto the Seller as liquidated damages for the breach of this Agreement."

¶70 The contract at issue, however, did not provide that the foregoing liquidated damages clause applied to any of the *down payment* received as earnest money, or at closing, or under the promissory note. Here, the original agreement clearly anticipated liquidated damages in the event Yellowstone II failed to make an *installment* payment. The contract is silent as to what would occur in the event of termination due to Yellowstone II's failure to pay in full the *down payment*, other than the overarching attorney's fees provision and the return of the property to Elk Park via the quit claim deed. The agreement's *Warranty Deed* provision, for example, provided that in the event Yellowstone II failed to "keep and perform each and every one and all of the terms, covenants, and conditions herein set forth, reserved, and contained on the part of the Buyer to be kept and performed" Elk Park could "declare a default," which meant that the warranty deed and other documents held in escrow "shall be redelivered to Seller." Elk Park has not presented a viable theory that would induce this Court to ignore the clear, express terms of the agreement prepared by its own counsel in which it failed, however improvidently, to anticipate the contingency that arose.

¶71 ▪ We conclude, therefore, that the liquidated damages provision in the contract did not govern the down payment. *See and compare with Schweigert v. Fowler* (1990), 240 Mont. 424, 433, 784 P.2d 405, 411 (disregarding party's unjust enrichment claim where contract for deed "expressly stated that in the event of purchaser's default, all

payments made and any improvements to the property would be retained by the sellers"); *Wendy's of Montana v. Larsen* (1982), 196 Mont. 525, 528-29, 640 P.2d 464, 466 (concluding that sellers fully performed, entitling them to earnest money payment as, liquidated damages pursuant to express provision in contract).

¶72 Thus, the District Court, in granting summary judgment in favor of Elk Park, should have turned to the rules provided by law, once it was clear that the rules to which the parties had agreed had failed to account for the contingency that arose.

¶73 Pursuant to Elk Park's counterclaim for breach, it clearly sought an action at law for contract damages for a total breach of the contract. Thus, the District Court erred by not following § 27-1-315, MCA, which—in the absence of a governing term between the parties—provides that damages for breach of an agreement to buy real property is determined by subtracting the fair market value of the property at the time of the breach from the contract price: here, $1,288,800. If there is any excess—meaning the fair market value is determined to be less than the contract price—Elk Park is legally entitled to recover this amount in damages. The seller is strictly limited to this difference, however, and cannot claim consequential damages. Thus, "the seller of the land gets all he bargained for at the time he irretrievably parted with the land." *See Whitney v. Bails* (1977), 172 Mont. 121, 123-25, 560 P.2d 1344, 1346-47 (discussing § 17-307, RCM, which was recodified as § 27-1-315, MCA, and overruling earlier decisions allowing recovery of consequential damages).

¶74 As for what becomes of Yellowstone II's partial performance—i.e., the $200,000 down payment—we turn to the interplay between § 27-1-315, MCA, and § 27-1-303, MCA, which limits the damages for breach of an obligation, similar to the equitable doctrine of unjust enrichment. Section 27-1-303, MCA, provides that no person can recover a "greater amount in damages for the breach of an obligation than he could have gained by the full performance thereof on both sides unless a greater recovery is specified by statute." In sum, Elk Park is legally entitled to the full benefit of its bargain—either $1,288,800 or property that is worth at least that much—and no more. We therefore conclude that Yellowstone II is legally entitled to offset any damages due Elk Park under § 27-1-315, MCA, by the $200,000 down payment retained by Elk Park, and is entitled to the return of any excess.

¶75 In remanding this case for a proper determination of damages consistent with the foregoing, we observe that the District Court did

not err in awarding attorney's fees to Elk Park, under the express provision in the parties' agreement. We further observe that other underlying factual determinations—such as improvements or waste committed on the property at issue, and interest on any sums due to either party—must be addressed upon remand. *See Whitney*, 172 Mont. at 125, 560 P.2d at 1347; § 27-1-213, MCA.

### *Issue 2.*

*Did the District Court err in granting summary judgment in favor of Park County on Yellowstone II's negligent misrepresentation claim?*

¶76 Yellowstone II claims that Park County breached its duty to provide correct information to Elk Park concerning its deed to the property that is the subject of this litigation, and that the county knew or should have known that other members of the public would rely on this information. Yellowstone II alleges that as a result of its reliance on said information, which it claims was false, it was damaged, and thus Park County should be liable for negligent misrepresentation.

¶77 Accordingly, Yellowstone II claims that the District Court erred when it entered summary judgment in favor of Park County on this issue. We disagree.

¶78 This Court has long recognized the common law tort of negligent misrepresentation. *See, e.g., Kitchen Krafters, Inc. v. Eastside Bank of Montana* (1990), 242 Mont. 155, 165, 789 P.2d 567, 573, *overruled in part on other grounds by Busta v. Columbus Hosp. Corp.* (1996), 276 Mont. 342, 370, 916 P.2d 122, 139. In *Kitchen Krafters*, we set out the following elements of a claim for negligent misrepresentation:

> a) the defendant made a representation as to a past or existing material fact;
>
> b) the representation must have been untrue;
>
> c) regardless of its actual belief, the defendant must have made the representation without any reasonable ground for believing it to be true;
>
> d) the representation must have been made with the intent to induce the plaintiff to rely on it;
>
> e) the plaintiff must have been unaware of the falsity of the representation; it must have acted in reliance upon the truth of the representation and it must have been justified in relying upon the representation;
>
> f) the plaintiff, as a result of its reliance, must sustain damage.

*Kitchen Krafters*, 242 Mont. at 165, 789 P.2d at 573 (relying on

Restatement (Second) of Torts § 552). Here, Yellowstone II's claim fails to offer disputed material facts concerning several of the necessary elements.

¶79 First, we previously determined in *Elk Park Ranch, Inc. v. Park County* that the representations made by the county to Elk Park concerning the recordability of its one-party deeds were legal opinions rather than material facts, and therefore the county was not equitably estopped from denying Elk Park's conveyance. *See Elk Park Ranch*, 282 Mont. at 166-67, 935 P.2d at 1138. Yellowstone II has not offered any new genuine dispute concerning the nature of the alleged representations made by the county and thus cannot overcome the first criteria, that Park County made a representation as to a past or existing *material fact*.

¶80 Next, there have been no material facts placed in dispute as to whether any or all of the representations made by Park County at any time were made "without any reasonable ground for believing [the representations] to be true." The record indicates, to the contrary, that although speculative, the original representations made to Elk Park by a county attorney in March of 1983, followed by various informal opinions by the county concerning the issue of estoppel, were based on reasonable grounds at the time.

¶81 Additionally, even assuming that Park County, through one of its agents, represented an untrue material fact to Elk Park without any reasonable ground to do so, that such a representation was made with the "intent to induce" Yellowstone II's reliance is too tenuous to be sustained by the record. Rather, the undisputed facts reveal that the only substantiated representations made directly to Yellowstone II leading up to and at the time the agreement was executed were made by either the seller, Elk Park, or title insurance agents. These representations allegedly asserted representations made by Park County officials. At no time before or contemporaneous with the execution of the agreement, however, did a Park County official directly represent to Yellowstone II the fact that the county would, without reservation, record a deed executed by Elk Park that would enable Yellowstone II, as the buyer, to then sell deeded 20-acre parcels located in section 20 without first undergoing subdivision review.

¶82 Further, the record is replete with uncontested evidence indicating that Yellowstone II was well aware of the likelihood that, notwithstanding the county's representations to Elk Park in the past, it may be required to undertake subdivision review in the event it wished to sell 20-acre parcels located in section 20. In particular, a

letter dated May 17, 1995, from the Park County Office of Clerk and Recorder to Elk Park clearly states that "Park County will not transfer any of these above described property as separate parcels unless they undergo subdivision review." The letter refers in part to those 20-acre parcels described in Elk Park's title to section 20. It is undisputed that this information was conveyed to David Phillips, president of Yellowstone II. Accordingly, Yellowstone II has failed to offer any evidence that disputes the county's contention that at the time of the transaction between the parties, Yellowstone II was fully aware of the potential "falsity" of earlier representations made by Park County.

¶83 Finally, Yellowstone II has offered little evidence to demonstrate that it acted "in reliance upon the truth" of those earlier representations made by the county, and that it was "justified" in relying upon only those representations in light of the conflicting information readily available at the time. *See generally Young v. Flathead County* (1988), 232 Mont. 274, 284-85, 757 P.2d 772, 778-79 (concluding that in light of conflicting available information developers unreasonably relied on county's legal opinion).

¶84 ■ We therefore agree with the District Court that although this transaction offered substantial fiscal reward, it ultimately required that Yellowstone II assume imminent risk—which it cannot be heard to complain of now. Accordingly, we affirm the summary judgment granted by the District Court in favor of Park County on Yellowstone II's complaint of negligent misrepresentation.

### Issue 3.
*Did the District Court err in determining that First American did not breach the title insurance policy issued to Yellowstone?*

¶85 At issue here is whether Yellowstone II's policy with First American insured only the marketability of the two sections sold by Elk Park, or whether the policy insured the "marketability" of individual 20-acre tracts within section 20. Yellowstone II claims that based on a reasonable interpretation of the policy, as well as the surrounding events at the time the policy was issued, the latter scenario applies and therefore First American breached by not compensating Yellowstone II for the full purchase price of both sections 29 and 20. We disagree and affirm the judgment of the District Court.

¶86 Yellowstone II apparently concedes that the title insurance policy at issue is not ambiguous. Instead, Yellowstone II contends that once Security Title, as an agent for First American, removed an exclusion

regarding recordability by Park County, it removed all doubt, at least in Yellowstone II's president's mind, that it would subsequently provide coverage for Yellowstone II's anticipated conveyance of individual 20-acre parcels.

¶87 Yellowstone II focuses its argument on the policy provision which insured against loss or damage caused by reason of "unmarketability of the title." The policy defined "unmarketability of the title" as "an alleged or apparent matter affecting the title to the land, not excluded or excepted from coverage, which would entitle a purchaser of the estate or interest described in Schedule A to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title."

¶88 Yellowstone II contends that "unmarketability of the title" includes its inability to freely convey 20-acre parcels, because the policy insured that title to "each of the parcels described in the policy was marketable." This theory, which was addressed in part under Issue 1, fails here for several reasons as well.

¶89 First, the substantial credible evidence overwhelmingly demonstrates that the title insurance policy covered two "parcels," section 29 and section 20. This description is clearly distinguishable from the description found in Elk Park's earlier one-party deed transaction, where each 20-acre tract was individually identified as a separate parcel of land. Thus, viewing such evidence in a light most favorable to First American, the District Court did not misapprehend the effect of this evidence in reaching its conclusions.

¶90 Next, an express provision in the First American policy provided that coverage was excluded by reason of "loss or damage attaching or created subsequent to the date of the policy." Also, the express exclusions provided that coverage was excluded by reason of "[a]ny law, ordinance or governmental regulation ... restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land ... and (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part." We agree with First American that even if the marketability of section 20 was adversely affected by Park County's alleged reversal of position or an expression of uncertainty regarding any subsequent conveyance and recording of 20-acre parcels by Yellowstone II, this damage was clearly excluded under the policy.

¶91 Next, having already agreed with the District Court that the deed to the property was recordable and title to section 20 was marketable up to the time that Elk Park terminated the agreement, we conclude

that the title insurance policy did not cover the foreseeable contingency that arose regarding whether Park County would accept individual deeds.

¶92 Yellowstone II nevertheless offers various interpretations of what, precisely, the policy would or would not cover. For example, Yellowstone II insists that the legal descriptions found in the documents of conveyance demonstrate that the parties "understood" that section 20 had already been subdivided into individual, separately titled parcels. These assertions, however, cannot overcome the plain, express terms of the title insurance policy, nor the substantial evidence that led the District Court to a contrary conclusion. Yellowstone II's president's own testimony, for example, clearly reveals that he did not believe that his organization was buying an existing legally subdivided section; rather, he acknowledged that, although it became impractical from a financial standpoint, undergoing subdivision review for section 20 was an option worth considering up until September of 1995.

¶93 ▮Accordingly, we agree with the District Court's conclusion that the title insurance policy here "insured only the marketability of Parcels I and II; it did not insure the marketability of future subdivided tracts within Parcels I and II–particularly without compliance with the Montana Subdivision and Platting Act." Thus, we agree with the court's conclusion that, based on the evidence, "Yellowstone II was willing to assume the risk that it may have to comply with Montana subdivision laws for conveyances of 20-acre tracts of Section 20 in the future."

### Issue 4.

*Did the District Court err in denying Yellowstone II's motion to compel discovery and in granting First American's motion for protective order?*

¶94 Apparently, this issue was raised by Yellowstone II in the event our decision here reversed the District Court on the issue of First American's liability, thus permitting it to proceed with its bad faith claim and determination of damages. Yellowstone II, in fact, directs this Court's attention to its unfair claim settlement claim, and that "[i]n furtherance of *this claim*, Yellowstone II served First American with discovery requests." (Emphasis added). Yellowstone II than proceeds to list, in detail, the subject matter of each request.

¶95 We conclude that this issue is rendered moot by our decision under Issue 3. Pursuant to Yellowstone II's unfair trade practice claim, under § 33-18-201, MCA, First American either refused to settle

Yellowstone II's claim or failed to institute litigation on its behalf to quiet title to the property at issue. In concluding that First American did not breach its policy agreement with Yellowstone II–i.e., there was no claim to settle–it is therefore clear, as a matter of law, it had no obligation to settle a claim or institute litigation. *See, e.g., Insured Titles, Inc. v. McDonald* (1996), 275 Mont. 111, 116, 911 P.2d 209, 211-12 (stating rule that if asserted claim is not covered by the policy, then the insurer has no duty to defend the insured).

¶96 We therefore will not address Yellowstone II's assertion that the District Court abused its discretion in denying its motion to compel and granting First American's motion for a protective order.

### *Issue 5.*

*Did the District Court err in denying Yellowstone II's motion to amend its complaint?*

¶97 Having concluded that Yellowstone II's claim for rescission of the subject sale and purchase agreement was rendered moot and without merit by Elk Park's termination due to Yellowstone II's default, we conclude that any amendment to its original complaint would not alter this result. Accordingly, we conclude that the District Court did not abuse its discretion in denying Yellowstone's motion to amend, and affirm its order.

¶98 This matter is affirmed in part, reversed in part, and remanded for recalculation of damages under Issue 1.

CHIEF JUSTICE GRAY, JUSTICES REGNIER and LEAPHART concur.