No. 04-333

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 159

THE MARY J. BAKER REVOCABLE
TRUST and LINDA J. ECKLUND, on
behalf of themselves and all similarly
situated persons and entities,

        Plaintiffs and Appellants,

   v.

CENEX HARVEST STATES, COOPERATIVES,
INC., and FRONT RANGE PIPELINE, L.L.C.,

        Defendants and Respondents.

APPEAL FROM:    The District Court of the Fourteenth Judicial District,
In and For the County of Wheatland, Cause No. DV 2003-006,
Honorable Randall I. Spaulding, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Thomas E. Towe, Towe, Ball, Enright, Mackey & Sommerfield, PLLP,
Billings, Montana

        For Respondent:

            John G. Crist, Crist Law Firm, Billings, Montana

            David A. Veeder, Attorney at Law, Billings, Montana

Submitted on Briefs:  January 5, 2005

Decided:    June 27, 2007

Filed:

                               Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1  The Mary J. Baker Revocable Trust and Linda J. Eklund (individually referred to as "Baker Trust" and "Eklund," respectively, and collectively referred to as "the Landowners") appeal the judgment of the District Court for the Fourteenth Judicial District, Wheatland County, denying the Landowners' motion for partial summary judgment and motion for class certification and granting the motion for summary judgment filed by Cenex Harvest States Cooperatives, Inc., and Front Range Pipeline, L.L.C. (collectively referred to as "Cenex").[1]  We affirm.

## ISSUES

¶2  The Landowners provide the following "STATEMENT OF ISSUES PRESENTED FOR REVIEW" at the outset of their opening brief:

1.  Whether the district court erred in granting Appellee-Defendants' Motion for Summary Judgment?

2.  Whether the district court erred in denying Appellants-Plaintiffs' Motion for Summary Judgment?

3.  Whether the district court erred in ignoring and refusing to apply § 1-4-102, MCA, in interpreting the granting language in the easements at issue?

4.  Whether the district court erred in ignoring the principle that an instrument should be construed against the drafter and refusing to apply precedent established in a strikingly similar case in Mississippi?

The argument section of the Landowners' brief, however, does not conform to this statement of the issues.  Rather, the Landowners' two issue headings are as follows:

---

[1] Front Range Pipeline, L.L.C., is a wholly-owned subsidiary of Cenex Harvest States Cooperatives, Inc.

*A.* *The District Court Failed to Consider the Circumstances Surrounding the Procurement of the Easements in Violation of § 1-4-102, MCA. The District Court Also Failed to Interpret the Easement Granting Language in the Light Most Favorable to the Landowners.*

*B.* *In the Alternative, the Easement Granting Language is Ambiguous, Thereby Requiring Consideration of the Surrounding Circumstances. The Landowners' Unrefuted Summary Judgment Evidence Supports the Entry of Summary Judgment in Their Favor or, in the Further Alternative, Consideration by a Jury.*

The Landowners' "alternative" arguments under Issue "B" do not appear in their opening statement of the issues presented for review. Furthermore, within the discussion under Issue "A" the Landowners present an argument that does not match any of their issue statements—namely, that the District Court erred in construing a term in the easement granting language contrary to the dictionary definition of that term.

¶3 Given this disconnect between the issues as articulated at the outset of the Landowners' opening brief and the issues as articulated and argued in the argument section of the brief, this Court is in the position of having to divine precisely what issues the Landowners are presenting to this Court. The Rules of Appellate Procedure, however, place the responsibility of matching arguments with issue statements on the Landowners, not this Court. *See* M. R. App. P. 23(a)(2) (requiring an appellant's brief to contain "[a] statement of the issues presented for review"); M. R. App. P. 23(a)(4) (requiring the argument section of the brief to contain the contentions of the appellant "with respect to the issues presented"). Accordingly, we will address the merits of the Landowners' actual arguments without regard to their uncoordinated issue statements.

¶4 In their first argument, the Landowners agree with the District Court that the language of the right-of-way agreements by which the Landowners granted easements across their properties to Cenex is unambiguous, but they disagree with the court's conclusion that Cenex has not exceeded the scope of those easements as defined in the right-of-way agreements. The Landowners contend (1) that the District Court erroneously construed the term "together with" as that term is used in the granting language; (2) that the District Court erred by failing to interpret the granting language in the light most favorable to the Landowners; and (3) that the District Court erred by refusing to consider the circumstances under which the easements were granted. As an alternative argument, the Landowners contend that the granting language is ambiguous, thus (1) requiring consideration of the circumstances under which the easements were granted or (2) creating a genuine issue of material fact and thereby precluding summary judgment for either party.

¶5 Accordingly, having studied the Landowners' arguments, we perceive the following five issues on this appeal:

1. Did the District Court erroneously construe the term "together with" as that term is used in the unambiguous granting language?

2. Did the District Court err by failing to interpret the unambiguous granting language in the light most favorable to the Landowners?

3. Did the District Court err by refusing to consider the circumstances under which the easements were granted?

4. Did the District Court err in determining that the granting language is unambiguous?

5. Did the District Court err in determining that there is no genuine issue as to any material fact?

## FACTUAL AND PROCEDURAL BACKGROUND

¶6 The Front Range Pipeline is a system of crude oil pipelines that extends approximately 320 miles from the United States/Canadian border to Laurel, Montana, by way of Santa Rita, Montana. The stretch from Santa Rita to Laurel consists of one 16-inch pipeline and a 36-strand fiber optic cable. For most of this distance, the fiber optic cable is buried in the same trench as the pipeline. The dispute in this case concerns Cenex's use of the fiber optic cable.

¶7 Cenex began acquiring easements for the pipeline and cable in 1994. This process continued into 1996 and involved approximately 450 parcels of land on the route between Santa Rita and Laurel. Cenex entered into a right-of-way agreement with Eklund on November 12, 1994, and with Baker Trust on February 13, 1995. Both agreements, which had been prepared by Cenex, contained the following granting language:

> [Grantors] do hereby grant, sell and convey unto [Cenex] . . . its successors and assigns, hereinafter referred to as Grantee, the right to construct, maintain, inspect, operate, protect, repair, replace, change the size of or remove a pipeline or pipelines or other appurtenances, for the transportation of oil, liquids and/or gases and the products thereof, together with a buried fiber optic communications cable, in, on, under or upon and along a strip of land Fifty Feet (50 ft.) in width to be selected by Grantee on, in, over and through the following described lands . . . .

5

The agreements further provided that "[t]he rights herein granted may be assigned in whole or in part" and that "[t]he terms, conditions and provisions of this agreement shall extend to and be binding upon the heirs, executors, administrators, personal representatives, successors and assigns of the parties hereto."

¶8     During this same period, Cenex and TRI Touch America, Inc. ("TRI") negotiated a Fiber Optic Agreement. Pursuant to this agreement (dated June 26, 1995), TRI agreed to install the fiber optic cable in the trench opened by Cenex for the pipeline and to maintain the cable, but the agreement specified that Cenex would own the cable. For its part, Cenex granted TRI an exclusive, indefeasible right to use 32 strands of the cable for an initial term of 25 years. The four remaining strands were specifically dedicated to the exclusive use of Cenex for the transmission of data, voice, and video communication along the pipeline.

¶9     Ultimately, the pipeline project was completed in late 1995, and the fiber optic cable became operational in mid 1996. Cenex assigned its rights, title, and interest in the pipeline and fiber optic cable to Front Range Pipeline, L.L.C., in September 1999.

¶10    The Landowners initiated the instant action on March 21, 2003. In essence, they alleged as follows: that the right-of-way agreements permitted Cenex to use the fiber optic cable only for purposes of operating and monitoring the pipeline; that Cenex had exceeded the scope of the easements by using and allowing a third party to use the cable for purposes other than operating and monitoring the pipeline; that Cenex had done so without the Landowners' authorization and without compensating the Landowners; that Cenex, thus, had surreptitiously created a valuable revenue-producing corporate asset;

6

that Cenex had retained the revenues and profits generated by this asset; and that these wrongful acts and omissions amounted to an unlawful scheme to convert money derived from the trespass upon the Landowners' properties. The Landowners claimed breach of contract, trespass, conversion, breach of the implied covenant of good faith and fair dealing, civil conspiracy, and unjust enrichment, and they requested certification under M. R. Civ. P. 23 as a class consisting of "[a]ll persons and entities who own land over which fiber optic cable has been strung or laid in the Cenex Front Range Pipeline right-of-way."

¶11 Cenex filed an answer denying the allegations concerning the scope of the easements and the allegations of wrongdoing. Thereafter, the parties filed cross-motions for summary judgment.

¶12 The Landowners, in their summary judgment motion, asserted that the granting language in the right-of-way agreements "is crystal clear in its scope." Focusing on the words "together with," they argued that this term means "in union with" and that "[a]uthority to bury a fiber optic cable 'in union with' the pipeline clearly suggests its use is limited to operating and monitoring the Pipeline." They also set forth a number of "circumstances under which the Easements were obtained" as support for their interpretation of "together with," citing § 1-4-102, MCA, as authority for the District Court to consider these circumstances. One such "circumstance" was that Cenex allegedly had obtained the easements by threatening to condemn the Landowners' properties pursuant to § 69-13-103(1), MCA. Finally, the Landowners argued that use of the fiber optic cable by parties other than Cenex "clearly creates added physical and legal

7

burdens" on the Landowners' properties. They provided a number of examples of such burdens—e.g., "[i]f there is a break in the line . . . multiple companies' repair crews must physically enter the land to replace and/or repair the cable," and "by going beyond the scope and intent of the Easement granting language, Cenex has saddled the land with a significant, additional legal burden - a potential cloud on their titles."

¶13    In its summary judgment motion, Cenex agreed that the granting language is "clear and unambiguous"; however, contrary to the Landowners' interpretation, Cenex argued that the language "place[s] no limits on how the fiber optic cable may be used" and "expressly give[s] Cenex the right to assign any of its rights, in whole or in part, to any third party." According to Cenex, therefore, it did not breach the right-of-way agreements by using or allowing the use of the cable for purposes other than operating or monitoring the pipeline, and all of the Landowners' claims, which were predicated on the same alleged violation of the terms of the right-of-way agreements, should be dismissed accordingly.

¶14    The District Court agreed with Cenex. First, the court noted that the Landowners were not challenging the validity of the right-of-way agreements. Second, the court determined that the granting language in the agreements is unambiguous. Third, the court read the granting language as placing no limitations upon the use of the fiber optic cable. In so doing, the court rejected the Landowners' "grammatical gymnastics," concluding that that the term "together with" means "and" in the context of the granting language.

¶15 With respect to the Landowners' reliance on § 1-4-102, MCA, the court stated that since the granting language was not ambiguous, the court could not consider the circumstances under which the right-of-way agreements had been made. The court also refused to construe the right-of-way agreements by reference to § 69-13-103(1), MCA, reasoning that this statute had no application here because the easements had been obtained by voluntary agreements, not condemnation. Lastly, the court concluded that the language of the right-of-way agreements gave Cenex authority to assign its rights thereunder.

¶16 Based on this analysis, the District Court dismissed all of the Landowners' claims, noting that each claim was predicated on Cenex's using the fiber optic cable for purposes other than operating and monitoring the pipeline and Cenex's assigning a portion of the easements to TRI, both of which the court had determined were not wrongful acts. The court also denied the Landowners' motion for class certification as moot. This appeal followed.

## STANDARD OF REVIEW

¶17 We review a district court's ruling on a motion for summary judgment de novo, applying the same criteria of M. R. Civ. P. 56 as did the district court. *Redies v. Attorneys Liability Protection Soc.*, 2007 MT 9, ¶ 26, 335 Mont. 233, ¶ 26, 150 P.3d 930, ¶ 26; *Montana-Dakota Utilities Co. v. City of Billings*, 2003 MT 332, ¶ 6, 318 Mont. 407, ¶ 6, 80 P.3d 1247, ¶ 6. Rule 56(c) provides that a motion for summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue

9

as to any material fact and that the moving party is entitled to a judgment as a matter of law." In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party, and all reasonable inferences that might be drawn from the offered evidence should be drawn in favor of the party opposing summary judgment. *Redies*, ¶ 26; *Porter v. Galarneau*, 275 Mont. 174, 179, 911 P.2d 1143, 1146 (1996). Summary judgment is an extreme remedy that should never be a substitute for a trial on the merits if a controversy exists over a material fact. *In re Dorothy W. Stevens Revocable Trust*, 2005 MT 106, ¶ 13, 327 Mont. 39, ¶ 13, 112 P.3d 972, ¶ 13; *Montana Metal Buildings, Inc. v. Shapiro*, 283 Mont. 471, 474, 942 P.2d 694, 696 (1997).

## DISCUSSION

¶18 The breadth and scope of an easement are determined by the actual terms of the grant. *Mularoni v. Bing*, 2001 MT 215, ¶ 32, 306 Mont. 405, ¶ 32, 34 P.3d 497, ¶ 32 (citing § 70-17-106, MCA, and *Van Hook v. Jennings*, 1999 MT 198, ¶ 12, 295 Mont. 409, ¶ 12, 983 P.2d 995, ¶ 12). The construction of a writing granting an interest in real property, in turn, is governed by the rules of contract interpretation. *See* § 70-1-513, MCA ("Grants are to be interpreted in like manner with contracts in general, except so far as is otherwise provided in this part."); *Mularoni*, ¶ 32 ("In interpreting the meaning of an easement grant, contract principles apply."). Thus, we begin by setting forth a number of the rules of contract interpretation that are pertinent to the issues discussed below.

¶19 The construction and interpretation of a contract is a question of law. *Ophus v. Fritz*, 2000 MT 251, ¶ 19, 301 Mont. 447, ¶ 19, 11 P.3d 1192, ¶ 19; *Van Hook*, ¶ 10.

Likewise, whether an ambiguity exists in a contract is a question of law. *Mularoni*, ¶ 32; *SVKV, L.L.C. v. Harding*, 2006 MT 297, ¶ 43, 334 Mont. 395, ¶ 43, 148 P.3d 584, ¶ 43. If the language of a contract is unambiguous—i.e., reasonably susceptible to only one construction—the duty of the court is to apply the language as written. *Ophus*, ¶ 23; *Carelli v. Hall*, 279 Mont. 202, 209, 926 P.2d 756, 761 (1996). However, if the language of a contract is ambiguous, a factual determination must be made as to the parties' intent in entering into the contract. *In re Marriage of Mease*, 2004 MT 59, ¶ 30, 320 Mont. 229, ¶ 30, 92 P.3d 1148, ¶ 30; *Klawitter v. Dettmann*, 268 Mont. 275, 281, 886 P.2d 416, 420 (1994).

¶20    The determination of whether an ambiguity exists in a contract is to be made on an objective basis. *See* Richard A. Lord, *Williston on Contracts* vol. 11 § 30:4, at 51 (4th ed., West 1999). Thus, "a conclusion of ambiguity is not compelled by the fact that the parties to a document, or their attorneys, have or suggest opposing interpretations of a contract, or even disagree as to whether the contract is reasonably open to just one interpretation." *Williston on Contracts* § 30:4, at 51-54 (footnotes omitted); *accord* E. Allan Farnsworth, *Farnsworth on Contracts* vol. II, § 7.12a, at 305-06 (2d ed., Aspen 1998); *Holmstrom v. Mutual Benefit Health & Accident Ass'n*, 139 Mont. 426, 428, 364 P.2d 1065, 1066 (1961) ("Ambiguity does not exist just because a claimant says so."); *Heggem v. Capitol Indem. Corp.*, 2007 MT 74, ¶ 30, 336 Mont. 429, ¶ 30, 154 P.3d 1189, ¶ 30 ("[A] mere disagreement over the meaning of an insurance provision does not render the provision ambiguous."). Rather, an ambiguity exists only if the language is

11

susceptible to at least two reasonable but conflicting meanings. *Ophus*, ¶ 23; *Van Hook*, ¶ 13.

¶21 "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Section 28-3-301, MCA; *accord* § 1-4-103, MCA ("In the construction of an instrument, the intention of the parties is to be pursued if possible."). The mutual intention of the parties, in turn, is to be ascertained from the writing if possible. Section 28-3-303, MCA ("When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible, subject, however, to the other provisions of this chapter."). In addition, evidence of the circumstances under which the contract was made and the matter to which it relates may be considered. Section 28-3-402, MCA ("A contract may be explained by reference to the circumstances under which it was made and the matter to which it relates."); § 28-2-905(2), MCA ("[The parol evidence rule] does not exclude other evidence of the circumstances under which the agreement was made or to which it relates."). However, such evidence of circumstances and subject matter is not admissible to add to, vary, or contradict the terms of the contract. *See* § 28-2-904, MCA ("The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument."); § 28-2-905(1), MCA ("Whenever the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms. Therefore, there can be between the parties and their representatives or successors in interest no evidence of the

terms of the agreement other than the contents of the writing except . . . (a) when a mistake or imperfection of the writing is put in issue by the pleadings[, or] (b) when the validity of the agreement is the fact in dispute." (paragraph breaks omitted)).[2]

¶22    With these principles in mind, we now turn to the Landowners' contentions.

¶23    ***Issue 1.  Did the District Court erroneously construe the term "together with" as that term is used in the unambiguous granting language?***

¶24    The Landowners do not contest Cenex's authority under the right-of-way agreements to construct and operate the fiber optic cable.  But they claim that the "plain and unambiguous" granting language "confirms that the fiber optic cable is ***incidental*** or ***subservient*** to the clearly dominant grant of a petroleum pipeline easement" and "limits its use to operating and monitoring the Pipeline."

¶25    As support for this position, the Landowners renew their contention that the term "together with" in the granting language unambiguously limits Cenex's use of the fiber optic cable to operating and monitoring the pipeline.  Again, the granting language provides as follows:

> [Grantors] do hereby grant, sell and convey unto [Cenex] . . . the right to construct, maintain, inspect, operate, protect, repair, replace, change the size of or remove a pipeline or pipelines or other appurtenances, for the

---

[2] Sections 28-2-904 and -905(1), MCA, are Montana's articulation of the parol evidence rule.  *See Savik v. Entech, Inc.*, 278 Mont. 152, 156, 923 P.2d 1091, 1094 (1996).  As a general proposition, the parol evidence rule "prohibits the admission of extrinsic evidence of prior or contemporaneous oral agreements, or prior written agreements, to explain the meaning of a contract when the parties have reduced their agreement to an unambiguous integrated writing."  *Williston on Contracts* § 33:1, at 541; *see also Black's Law Dictionary* 1139 (Bryan A. Garner ed., 7th ed., West 1999) (defining the parol evidence rule as "[t]he principle that a writing intended by the parties to be a final embodiment of their agreement cannot be modified by evidence that adds to, varies, or contradicts the writing").

> transportation of oil, liquids and/or gases and the products thereof, *together with* a buried fiber optic communications cable, in, on, under or upon and along a strip of land Fifty Feet (50 ft.) in width to be selected by Grantee on, in, over and through the following described lands . . . . [Emphasis added.]

The Landowners argue that because the language pertaining to the fiber optic cable is prefaced with the words "together with," and because this term is defined as "in union with" or "along with" (citing *Black's Law Dictionary* 1487 (6th ed. 1990), and *Gilmore v. Mulvihill*, 109 Mont. 601, 613, 98 P.2d 335, 341 (1940)), the granting language "clearly limits" the use of the fiber optic cable to operating and monitoring the pipeline. In the Landowners' view, the import of the term "together with" is "in connection with"; in other words, the fiber optic cable is to be used "in connection with" the pipeline.

¶26 The District Court however, reasoned that "[the words 'together with'] mean nothing more than 'and' in the context of the granting language." The court stated that *Black's Law Dictionary* 79 (5th ed. 1979) defines "and" as meaning "together with" and "along with," and that *Webster's Third New International Dictionary* 2404 (1971) defines the term "together with" as "along with," "in addition to," and "as well." (The court consulted *Webster's Third New International Dictionary* because this Court had relied on *Webster's New International Dictionary* in *Gilmore* when defining the word "together.") Thus, under the District Court's interpretation of "together with," the Landowners granted Cenex the right to bury a pipeline and a fiber optic cable, not a pipeline and a fiber optic cable "to be used in connection therewith."

¶27 We agree with the District Court and reject the Landowners' strained interpretation of "together with." Whether "together with" is defined as "in union with,"

"along with," "in addition to," "as well," or "and," the term—on its face—simply does not carry the meaning the Landowners ascribe to it. As support for their "in connection therewith" interpretation, the Landowners rely on the Mississippi Supreme Court's decision in *McDonald v. Mississippi Power Co.*, 732 So.2d 893 (Miss. 1999). *McDonald*, however, does not support the Landowners' position.

¶28   The Mississippi Power Company ("MPC") obtained easements through a number of properties by way of condemnation, eminent domain proceedings, and voluntary easements. The easements gave MPC the right to

> "construct, operate and maintain electric lines and all telegraph and telephone lines, towers, poles, wires, and appliances and equipment necessary or convenient *in connection therewith* from time to time and counterpoise wire and other counterpoise conductors, upon, over, under, and across a strip of land . . ."

*McDonald*, ¶ 2 (ellipsis in original, emphasis added).

¶29   In *McDonald*, MPC sought a declaratory judgment that it had the right under the easements to install, utilize, and sublet space on fiber optic cables. The chancery court determined that laying fiber optic cables was "well within the express or implied language of the easements" and that MPC had the right to "leas[e] or sell[] excess capacity on said lines, without further compensation to the landowners." *McDonald*, ¶ 4 (internal quotation marks omitted). The Mississippi Supreme Court agreed with the first conclusion but disagreed with the latter. The court observed that the clear intent of the easements was "to grant MPC the right to install and maintain telephone lines" and a fiber optic cable "is nothing more than a technologically advanced or new type of telephone line." *McDonald*, ¶ 9. However, with respect to MPC's desire to sublet space

15

on the fiber optic cables to third parties for uses other than providing electricity, the court observed:

> MPC's current easements contain limiting language which precludes them from utilizing the fiber optics cable for anything but services provided in connection with supplying electricity. According to the phrase in question, MPC's use of "telegraph and telephone lines, towers, poles, wires, and appliances and equipment" is limited to "in connection therewith" MPC's service of providing electricity to its customers. Although it would not constitute an additional servitude on the property, MPC without more definite easements simply does not have the authority. Since MPC drafted a number of the easements in question, they are interpreted most favorably to the landowner. We find that the chancellor erred in holding that the language of the above easements permitted MPC to sublease space on its fiber optics cables for purposes other than those which are in connection with providing electricity.

*McDonald*, ¶ 10 (citation omitted). The court reached the same conclusion with respect to the easements that had been obtained through condemnation or eminent domain proceedings. *See McDonald*, ¶ 11.

¶30 In the case at hand, by contrast, there is no such limiting language. The Landowners insist that "there is little difference between the words 'together with' in the instant case and 'in connection therewith' in *McDonald*" and that use of the word "together" in the instant case and "connection" in *McDonald* "is a distinction without a difference." We disagree. It seems that the Landowners would have us rewrite the granting language to say:

> [Grantors] do hereby grant, sell and convey unto [Cenex] . . . the right to construct, maintain, inspect, operate, protect, repair, replace, change the size of or remove a pipeline or pipelines or other appurtenances, for the transportation of oil, liquids and/or gases and the products thereof, ~~together with~~ and a buried fiber optic communications cable to be used in connection therewith . . . . [Strikethrough for old language; underscore for new language.]

16

This we may not do. *See* § 1-4-101, MCA ("In the construction of an instrument, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted."); *cf. City of Missoula v. Mix*, 123 Mont. 365, 372, 214 P.2d 212, 216 (1950) ("Where the language of a reservation in a grant is clear, certain and unambiguous, it must be given effect as written."). Accordingly, we hold that the term "together with," as used in the granting language, does not unambiguously limit Cenex's use of the fiber optic cable to operating and monitoring the pipeline.

¶31   *Issue 2. Did the District Court err by failing to interpret the unambiguous granting language in the light most favorable to the Landowners?*

¶32   The Landowners argue that the District Court erred by failing to interpret the granting language in the light most favorable to the Landowners. They contend that "with a very few minor exceptions, Cenex drafted all of the [right-of-way agreements]"; thus, "[i]f Cenex truly intended the Easement granting language to be unlimited in its use, Cenex should have said so." As support for this argument, the Landowners rely on *McDonald*, in which the Mississippi Supreme Court stated: "Since MPC drafted a number of the easements in question, they are interpreted most favorably to the landowner." *McDonald*, ¶ 10. The Landowners also cite *United States v. Seckinger*, 397 U.S. 203, 210, 90 S. Ct. 880, 884 (1970) (reciting "the general maxim" that "a contract should be construed most strongly against the drafter"), and *Anderson v. Baker*, 196 Mont. 494, 501, 641 P.2d 1035, 1039 (1982) (noting that in " 'take-it-or-leave-it' situations, where adhesion contracts are involved, . . . the terms are to be construed

17

against the drafter and any ambiguities are to be resolved in favor of the party having no voice in arriving at the document's terms").

¶33 Cenex contends that "[i]t is only when the terms of an agreement or contract are uncertain or ambiguous that they are construed against the party causing the uncertainty"; thus, "[s]ince the district court found the [granting language] unambiguous, there is no reason to construe [it] against Cenex." As support for this argument, Cenex cites *C & L Enterprises, Inc. v. Citizen Band Potawatomi Tribe of Oklahoma*, 532 U.S. 411, 423, 121 S. Ct. 1589, 1596-97 (2001) (stating that "the common-law rule of contract interpretation that a court should construe ambiguous language against the interest of the party that drafted it" was inapposite because the contract in question was not ambiguous (internal quotation marks omitted)), and *Matter of Estate of Thies*, 273 Mont. 272, 276, 903 P.2d 186, 188 (1995) (stating that our decision in *Matter of Estate of Flasted*, 228 Mont. 85, 741 P.2d 750 (1987), in which we construed a contractual ambiguity against the drafter, did not apply in *Thies* because the agreement in question was " 'straightforward and simple' ").

¶34 We agree with Cenex. The Restatement (Second) of Contracts explains the rationale for the construction-against-drafter principle as follows:

> Where one party chooses the terms of a contract, he is likely to provide more carefully for the protection of his own interests than for those of the other party. He is also more likely than the other party to have reason to know of uncertainties of meaning. Indeed, he may leave meaning deliberately obscure, intending to decide at a later date what meaning to assert.

18

*Restatement (Second) of Contracts* § 206 cmt. a (1981). Thus, the Restatement provides that "[i]n choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds." *Restatement (Second) of Contracts* § 206.

¶35 Yet, it is not necessary to "choos[e] among . . . reasonable meanings" when the promise, agreement, or term thereof is reasonably susceptible to only one meaning. In other words, the general maxim that a court should construe contract language against the party that drafted it presupposes that the language is reasonably susceptible to more than one construction. *See C & L Enterprises*, 532 U.S. at 423, 121 S. Ct. at 1596-97; *Thies*, 273 Mont. at 276, 903 P.2d at 188.

¶36 Here, the Landowners contend that the granting language is unambiguous. Thus, the construction-against-drafter principle does not apply. Rather, the duty of the District Court was to apply the language as written. *Ophus*, ¶ 23; *Carelli*, 279 Mont. at 209, 926 P.2d at 761. Accordingly, we hold that the District Court did not err by not interpreting the granting language in the light most favorable to the Landowners.

¶37 ***Issue 3. Did the District Court err by refusing to consider the circumstances under which the easements were granted?***

¶38 The Landowners contend that the granting language of the right-of-way agreements must be considered in light of the circumstances under which the agreements were made and that the District Court erred when it refused to do so. The Landowners rely on § 1-4-102, MCA, which provides:

19

> For the proper construction of an instrument, the circumstances under which it was made, including the situation of the subject of the instrument and of the parties to it, may also be shown so that the judge be placed in the position of those whose language he is to interpret.[3]

The District Court reasoned that § 1-4-102 did not apply in this case "[b]ecause the Easements are unambiguous." The Landowners point out, however, that § 1-4-102 does not say "except when the language of the instrument itself is unambiguous." The Landowners also point out that in *Tester v. Tester*, 2000 MT 130, 300 Mont. 5, 3 P.3d 109, this Court applied § 1-4-102 to a deed that we determined was unambiguous:

> The plain language of the Funk deed is unambiguous. An unambiguous deed must be interpreted according to its language as written, without resort to extrinsic evidence of the grantor's intent. For proper construction of an instrument § 1-4-102, MCA, allows us to examine the "circumstances under which it was made, including the situation of the subject of the instrument and of the parties to it."

*Tester*, ¶ 25 (citation omitted). We then proceeded to discuss the circumstances under which the Funk deed had been made. *See Tester*, ¶¶ 25, 27-28. Therefore, the Landowners contend, "[u]nder § 1-4-102, MCA, a court may look to the surrounding circumstances in order to construe an instrument ***even when that instrument is unambiguous on its face.***"

¶39 Cenex counters that § 1-4-102 applies only where an ambiguity exists in the language of the instrument. As support for this position, they cite *Payne v. Buechler*, 192 Mont. 311, 628 P.2d 646 (1981), *Spraggins v. Elvidge*, 192 Mont. 8, 625 P.2d 1151

---

[3] Similarly, § 28-3-402, MCA, provides that "[a] contract may be explained by reference to the circumstances under which it was made and the matter to which it relates," and § 28-2-905(2), MCA, provides that the parol evidence rule, as articulated in § 28-2-905(1), MCA, "does not exclude other evidence of the circumstances under which the agreement was made or to which it relates, as described in 1-4-102."

(1981), and *Yellowstone II Dev. Group v. First American Title Ins.*, 2001 MT 41, 304

Mont. 223, 20 P.3d 755.  In *Payne*, this Court stated:

> [Section 1-4-102] relates to construction and interpretation of written
> instruments but is irrelevant here.  The language of the contract is plain and
> unambiguous.  Under such circumstances, the language alone controls and
> there is nothing for the Court to interpret or construe.  Section 28-3-401,
> MCA and section 28-3-303, MCA.  [Section 1-4-102] only applies where
> an ambiguity exists in the language of the contract.

*Payne*, 192 Mont. at 317, 628 P.2d at 650.  Similarly, we stated in *Spraggins*:  "When the

contract is clear and unequivocal on its face, section 1-4-102, MCA, does not apply."

*Spraggins*, 192 Mont. at 12, 625 P.2d at 1153 (citing *Ryan v. Ald, Inc.*, 146 Mont. 299,

406 P.2d 373 (1965)).  Finally, in *Yellowstone II*, we stated:

> Determining whether a term in a contract is ambiguous—i.e., subject to
> more than one reasonable meaning in view of the contract as a whole—is
> not a question involving parol evidence, but merely one of law concerning
> interpretation and potential use of extrinsic evidence.

*Yellowstone II*, ¶ 35.

¶40    Given the apparently inconsistent statements in *Tester*, *Payne*, *Spraggins*, and

*Yellowstone II* concerning the applicability of § 1-4-102, it is necessary to clarify whether

ambiguity is a prerequisite to the statute's application in a given case.

###    A.    Clarification of the Applicability of § 1-4-102, MCA

¶41    Section 1-4-102 derives from, and is identical to, § 1860 of the Code of Civil

Procedure of California (1871), which in turn is credited to § 1693 of the New York Code

of Civil Procedure.[4]  The language of § 1-4-102, which has remained unchanged since its

---

[4] *See* Revised Laws of the State of California, Code of Civil Procedure, Reported
by Commissioners, at 464 (1871).  Our research discloses that "N. Y. C. C. P. § 1693," to

enactment in 1877 (*see* Laws of Montana Territory, 1877, § 614, at 198), is a codification of the decisions of the courts on this subject. *See Shreve v. Copper Bell Min. Co.*, 11 Mont. 309, 323, 28 P. 315, 315-16 (1891) (noting the same about § 1-4-107, MCA, which was enacted as § 615 of the Laws of Montana Territory, 1877, at 198-99). Thus, an appropriate starting point for this discussion is to consider how the principles now codified in § 1-4-102 were understood and applied during that period.

¶42 In *Donnell v. Humphreys*, 1 Mont. 518 (Mont. Terr. 1872), the parties disputed the language of a deed, dated June 23, 1870, by which Humphreys conveyed to Donnell the following property:

> "The ditches known as the Silver Bow Ditch Company's ditches; said ditches carrying water from Silver Bow creek to Butte City and the placer mines in that vicinity, and more particularly known as the Humphreys and Allison ditches."

*Donnell*, 1 Mont. at 522-23. At trial, Donnell sought to prove that the "Park ditch" was included in this conveyance. To that end, Donnell offered the following testimony: that the Silver Bow Ditch Company's ditches were made up of and included what was then known as the "upper ditch," the "lower ditch," and the "Park ditch"; that the upper and lower ditches carried water from Silver Bow creek and its tributaries to the placer mines, in the vicinity of Butte City; that the Park ditch was built to supply water from a branch of Bolder creek to Silver Bow creek and, in turn, to the upper and lower ditches; that the Park ditch, thus, was a feeder of the upper and lower ditches; that at the time of the

which § 1860 of the Code of Civil Procedure of California is credited, is most likely a reference to the *proposed* New York Code of Civil Procedure. *See* John T. Fitzpatrick, *Procedural Codes of the State of New York*, 17 Law Lib. J. 12, 16 (1924) (noting that the Code of Civil Procedure submitted December 31, 1849, never became law in New York).

conveyance, the waters from the Park ditch had always flowed through the upper and lower ditches; and that the three ditches were known and reputed as the Silver Bow Ditch Company's ditches and, more particularly, as the Humphreys and Allison ditches. *Donnell*, 1 Mont. at 523. The trial court sustained an objection to this testimony.

¶43 On appeal, the Supreme Court of the Montana Territory considered whether the trial court had erred in rejecting the proffered testimony. In so doing, the Court first observed that "parol contemporaneous evidence is inadmissible to contradict or vary the terms of a valid written instrument" because "when parties have deliberately put their contracts in writing in such terms as import a legal obligation, without uncertainty or ambiguity as to the object, nature and extent of their agreements, it is conclusively presumed that the whole of the contract was reduced to writing." *Donnell*, 1 Mont. at 525-26. The Court explained, however, that parol evidence is always admissible to give effect to the contract:

> And so the intent of the parties must be gathered from what is written rather than from parol evidence, but the language of the instrument may be construed by the light of surrounding circumstances, and, so far as possible, the court may put itself in the place of the parties, and may interpret the language from this standpoint, but nothing can be added to or taken from the written words.
> So extrinsic parol evidence is always admissible to give effect to a written instrument, by applying it to its proper subject-matter, by proving the circumstances under which it was made, thereby enabling the court to put themselves in the place of the parties with all the information possessed by them, the better to understand the terms employed in the contract, and to arrive at the intention of the parties.
> Instruments are to be interpreted according to their subject-matter, and parol evidence may be resorted to in order to ascertain the nature and qualities of the subject to which the instrument refers. Whatever indicates the nature of the subject, is a just medium of interpretation of the language of the parties, and is also a just foundation for giving the instrument an

interpretation when considered relatively, different from that which it would receive if considered in the abstract.

It is necessary to the validity of a grant that the thing granted should be capable of being distinguished from all other things of the kind, but it is not necessary that the description should be such as to identify the object without the aid of extraneous testimony. And when the description alludes to facts beyond the deed, parol evidence may be offered, not to contradict the description, but to locate the deed upon the land.

*Donnell*, 1 Mont. at 526 (citations and emphases omitted).

¶44 The Court reasoned that it was not possible for the trial court, looking at the language of the deed alone, to say how many ditches were known as "the Humphreys and Allison ditches" and whether the Park ditch was an essential component of a system of ditches by which water was carried from Silver Bow creek to the mines of Butte City. *Donnell*, 1 Mont. at 527. In this regard, the Court noted:

If the upper and lower ditches were valueless without the Park ditch, and all three were known as the Humphreys and Allison ditches, then we must suppose that the party paying more than $6,000 for the Humphreys and Allison ditches, and the party receiving that sum in consideration of the conveyance, intended to convey the three ditches in question, for the value of each would so depend upon the other as to make the three one property, one subject-matter.

*Donnell*, 1 Mont. at 528. Accordingly, the Court held that parol evidence was admissible to apply the deed to its proper subject matter and that Donnell's proffered testimony should not have been rejected by the trial court.

¶45 The Court provided an insightful clarification of the foregoing principles in *Taylor v. Holter*, 1 Mont. 688 (Mont. Terr. 1872). At issue in that case was a deed by which Hoyt and Holter granted Taylor, Smith, and Cleveland "[a]ll the water of the right-hand fork of Oro Fino gulch." *Taylor*, 1 Mont. at 691 (internal quotation marks omitted). At

24

trial, testimony was offered to prove that the grantors had intended to convey, and that the grantees had intended to receive by virtue of this deed, the waters of the *left*-hand fork of Oro Fino gulch. The trial court sustained an objection to this testimony.

¶46     On appeal, the Supreme Court restated the principles set forth in *Donnell* (quoted above in ¶ 43) and then clarified the applicability of these principles:

> The true rule is, to give effect to the intention of the parties if the words they employ will admit of it. But if the words used, by their clearness and certainty, absolutely forbid the aid of extrinsic evidence in their interpretation, it would be changing the certain written contract of the parties to let in outside parol proof.
>     Parties must contract for themselves, courts cannot make contracts for them, and the rules of interpretation are utterly unavailing to aid a contract or agreement that is specific and certain in its terms, and clearly speaks what the parties intended it should. If parties convey the right-hand fork of Oro Fino gulch, courts nor witnesses cannot say they thereby intended the left-hand fork. As well might they say they intended the left fork of the Missouri river, or the north fork of the Yellowstone, and all the circumstances and surroundings of the parties, however plausible they may appear, cannot blot out the language of the deed and supply other language in its place. Such circumstances and surroundings may aid the language but cannot destroy it. They can apply the deed to its proper subject, and when thus applied, the language must describe such subject, and be entirely consistent with it. The language must control and not the circumstances. The written words must stand and no parol proof can destroy them.

*Taylor*, 1 Mont. at 698-99 (emphases omitted). The Court held, therefore, that the proffered parol evidence had been properly rejected by the trial court.

¶47     Thus, as a general rule, evidence of the circumstances under which an instrument was made may not be considered where the language of the instrument is clear and certain in its terms. *Taylor*, 1 Mont. at 698-99; *see also Ming v. Pratt*, 22 Mont. 262, 265, 56 P. 279, 280 (1899) (stating that resort to evidence of the surroundings of the parties, the subject matter, and prior and contemporaneous oral negotiations and promises

illumining the design and intent of the parties is not permissible where the intention and understanding are explicitly declared upon the face of the writing itself); *Kimball v. Semple*, 25 Cal. 440, 449 (1864); *Richardson v. Scott River W. and M. Co.*, 22 Cal. 150, 155-56 (1863). However, as recognized in the authorities discussed below, this rule does not preclude consideration of surrounding circumstances for the purpose of determining, as a preliminary matter, whether the instrument contains an ambiguity.[5] For instance, borrowing the illustration set forth in *Taylor*, 1 Mont. at 694, if a grantor conveys "my house and lot in Helena," it would be proper for the court to consider the circumstance that the grantor owned two houses and lots in Helena, thus rendering "my house and lot in Helena" susceptible to at least two reasonable but conflicting meanings; and extrinsic evidence would also be admissible in this situation to show which of the two houses the grantor intended to convey. By contrast, if the grantor conveyed "my brick house on Main Street," the fact that the grantor also owned a wooden house on Rodney Street would not render "my brick house on Main Street" ambiguous; and extrinsic evidence would not be admissible to show that the grantor intended to convey the wooden house.

---

[5] We note that there may be other purposes for which evidence of surrounding circumstances is admissible. *See*, *e.g.*, *Weinberg v. Farmers State Bank of Worden*, 231 Mont. 10, 24-25, 752 P.2d 719, 728-29 (1988) (consideration of surrounding circumstances proper to establish the existence of an agreement between the parties); *Anderson v. Baker*, 196 Mont. 494, 500-03, 641 P.2d 1035, 1038-40 (1982) (consideration of surrounding circumstances proper to ascertain the intent of depositor when she added her son's name to signature cards drafted by the depository institution). However, we need not articulate here a comprehensive list of the situations in which § 1-4-102, MCA, might apply. Rather, we will confine our discussion to the applications of § 1-4-102 raised by the parties in the case at hand.

¶48    It is thus stated in the *Restatement (Second) of Contracts* § 212 cmt. b (1981): "It is sometimes said that extrinsic evidence cannot change the plain meaning of a writing, but meaning can almost never be plain except in a context." Accordingly, the Restatement takes the position that

> [a]ny determination of meaning or ambiguity should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties. But after the transaction has been shown in all its length and breadth, the words of an integrated agreement remain the most important evidence of intention.

*Restatement (Second) of Contracts* § 212 cmt. b (cross-references omitted).

¶49    The Ohio Supreme Court long ago articulated one rationale for this approach:

> These parties [to the written contract in question] may be fairly presumed to have understood the matter about which they were contracting. But the same thing cannot be said of every court and jury that may be called on to interpret their contract. To enable the court and jury to be as wise as the parties, and so to arrive at and give application to the words they have used, and thus carry out their intentions, the law permits them to hear a full description, from evidence, of the subject matter of the contract, and of all the circumstances that surrounded the parties at the time it was made; and to learn what were the motives and inducements that led to the contract, and the object to be attained by it; . . . . The object or tendency of this evidence is not to contradict or vary the terms of the instrument, but to enable the court to come to the language employed, with an enlightened understanding of the subject matter in reference to which it has been used.

*Hildebrand v. Fogle*, 20 Ohio 147, 157 (1851); *see also Jenny Lind Co. v. Bower & Co.*, 11 Cal. 194, 198 (1858); *Kimball*, 25 Cal. at 449.

¶50    A more recent articulation of these principles appears in *Corn Exchange Nat. Bank & Trust Co. v. Taubel*, 175 A. 55 (N.J. 1934), where the Court of Errors and Appeals of New Jersey explained as follows:

27

The standard of interpretation of an integrated agreement, supported by the weight of modern authority, is the meaning that would be attached to the integration by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the writing, other than oral statements by the parties of what they intended it to mean, except where it produces an ambiguous result, or is excluded by rule of law establishing a definite meaning. This has been termed a primary rule of interpretation which is always applicable, whether the writing seems clear or ambiguous. The underlying theory is that as all language will bear some different meanings, evidence of surroundings is always admissible in the interpretation of integrated agreements, but not for the purpose of giving effect to an intent at variance with any meaning that can be attached to the words. . . . So far as the evidence tends to show, not the meaning of the writing, but an intention wholly unexpressed in the writing, it is irrelevant.

*Corn Exchange*, 175 A. at 58 (citations and internal quotation marks omitted).

¶51    Likewise, in *S.W. Bridges & Co. v. Bank of Fergus County*, 77 Mont. 524, 538, 251 P. 1057, 1060-61 (1926), this Court stated:

The face of an instrument is not always conclusive of its purpose. The rule regards the circumstances of the parties, and executes their real intention, and prevents either of the parties to the instrument from committing a fraud on the other by claiming it to be what it in fact is not. In other words, the real transaction may be proved.

And as long ago as *Newell v. Nicholson*, 17 Mont. 389, 43 P. 180 (1896), we recognized that words, while they may be perfectly clear to the contracting parties, may not be correctly understood by the court tasked with the construction of the contract. The dispute in *Newell* was over the meaning of the words "Don't sell we to exchange any goods that don't sell; credit for same," and "Sales guarantied." Citing §§ 632 and 633 of the Code of Civil Procedure (Comp. St. 1887) (now §§ 1-4-102 and -107, MCA, respectively), we held that the trial court had not erred in considering the testimony of a number of merchants, salesmen, and businessmen showing that the words had a technical

or peculiar signification and were so used and understood in the particular instance. *Newell*, 17 Mont. at 392-93, 43 P. at 181.

¶52    This same point was made in *AM Intern. v. Graphic Management Inc.*, 44 F.3d 572, 575 (7th Cir. 1995), where the Seventh Circuit observed:

> The famous contract in *Raffles v. Wichelhaus*, 2 H. & C. 906, 159 Eng.Rep. 375 (Ex. 1864), . . . was clear on its face.  It called for the shipment of a specified amount of cotton from one port to another on the ship *Peerless*. Clear as a bell.  Only there were two (if not more) ships *Peerless*, and it was impossible to tell which one the contract referred to.  The contract was unclear because clarity in a contract is a property of the correspondence between the contract and the things or activities that it regulates, and not just of the semantic surface.
>     Take another example.  Suppose the parties to the contract in *Raffles* had been members of a trade in which the term "cotton" was used to refer to guncotton rather than to the cotton used in textiles.  The ordinary reader of English would not know about this special trade usage, and so would suppose the contract unambiguous. Again, the ambiguity is in the reference, that is, the connection between the word and the object that it denotes.

*See also* Margaret N. Kniffin, *Corbin on Contracts* vol. 5, § 24.7, at 30-39 (Joseph M. Perillo ed., rev. ed., Lexis 1998).

¶53    In light of the foregoing authorities, we hold that "the circumstances under which [an instrument] was made, including the situation of the subject of the instrument and of the parties to it," § 1-4-102, MCA, may be shown and considered to aid the court in determining, as a preliminary matter, whether the instrument contains an ambiguity.  We emphasize, however, that not all "circumstances" are admissible for this purpose.  As stated earlier, an instrument does not contain an ambiguity simply because the parties have or suggest opposing interpretations thereof or disagree as to whether the language is reasonably open to just one interpretation.  Rather, the determination of whether an

29

ambiguity exists in a contract is made on an objective basis. *See* ¶ 20, *supra*. Addressing this subject in some detail, the Seventh Circuit (interpreting Illinois law) explained:

> [A contract] may be extrinsically ambiguous, being clear on its face but someone who knows the context of the contract would know that the contract means something other than what it seems to mean. In that situation, we distinguish between "subjective" and "objective" evidence of ambiguity. "Subjective" evidence of ambiguity is the testimony of the parties themselves as to what they believe the contract means, which is invariably self-serving, inherently difficult to verify and thus, inadmissible. . . . "Objective" evidence, on the other hand, is evidence of ambiguity that can be supplied by disinterested third parties, such as custom or usage of the trade. This kind of evidence is admissible because the ability of one of the contracting parties to fabricate such evidence is limited.

*Home Ins. Co. v. Chicago and Northwestern Transp. Co.*, 56 F.3d 763, 768 (7th Cir. 1995) (citations and some internal quotation marks omitted).

¶54 Another reason objective evidence is admissible, while subjective evidence is not, is "because there is a further screen to protect the parties: the objective evidence of ambiguity must be presented first to the judge, and only if the judge concludes that it establishes a genuine ambiguity is the evidence given to the jury." *Home Ins. Co.*, 56 F.3d at 768-69 (citing *AM Intern.*, 44 F.3d at 575, and *Sunstream Jet Exp. v. International Air Service Co.*, 734 F.2d 1258, 1267-68 (7th Cir. 1984)). This procedural mechanism is characterized in *Williston on Contracts* as "correctly allocat[ing]" to the judge and the jury their respective responsibilities:

> First, the evidence is considered by the court to enable it to determine whether the contract or clause is ambiguous; if it is not, the inquiry ends and parol evidence is kept from the jury. If, however, the judge is convinced by the extrinsic evidence that an ambiguity exists, the evidence is presented to the jury so that it may determine, on the basis of the written contract, as explained or supplemented by the extrinsic evidence, which of two or more meanings the parties intended.

Richard A. Lord, *Williston on Contracts* vol. 11, § 33:39, at 815-16 (4th ed., West 1999); *see also* Margaret N. Kniffin, *Corbin on Contracts* vol. 5, § 24.7, at 39-54 (Joseph M. Perillo ed., rev. ed., Lexis 1998); E. Allan Farnsworth, *Farnsworth on Contracts* vol. II, § 7.12, at 295-97 (2d ed., Aspen 1998).

¶55 We are persuaded that this procedural mechanism is the correct approach and therefore adopt it. Thus, for the purpose of aiding the court in determining, as a preliminary matter, whether the instrument contains an ambiguity, objective evidence of "the circumstances under which [the instrument] was made, including the situation of the subject of the instrument and of the parties to it," may be shown and considered. Section 1-4-102, MCA. If the court determines that the instrument contains no ambiguity, then the extrinsic evidence may not be considered further. *See Doble v. Bernhard*, 1998 MT 124, ¶ 19, 289 Mont. 80, ¶ 19, 959 P.2d 488, ¶ 19 ("If the terms of the contract are clear . . . there is nothing for the courts to interpret or construe and the court must determine the intent of the parties from the wording of the contract alone." (internal quotation marks omitted)). But if the court determines that an ambiguity is present in the instrument, then the extrinsic evidence may be introduced at trial to allow the trier of fact to determine the intent of the parties in entering into the contract. *See Olson v. Jude*, 2003 MT 186, ¶ 47, 316 Mont. 438, ¶ 47, 73 P.3d 809, ¶ 47 ("Where a written instrument is ambiguous, extrinsic evidence may be utilized to discover the parties' intent."); *Martin v. Laurel Cable TV, Inc.*, 215 Mont. 229, 233, 234, 696 P.2d 454, 457 (1985) ("The [trial] court properly accepted parol testimony to explain circumstances surrounding the lease

31

agreement, thus resolving the ambiguity existing in the instrument." (citing §§ 1-4-102 and 28-2-905(2), MCA)).

¶56 With these clarifications concerning the applicability of § 1-4-102, MCA, in mind, we now consider the cases cited by the Landowners (*Tester*) and Cenex (*Spraggins*, *Payne*, and *Yellowstone II*) for their respective arguments concerning the statute's applicability in this case.

### B.    *Spraggins*, *Payne*, *Yellowstone II*, and *Tester*

¶57 In *Spraggins*, the written contract in question was "clear on its face." *Spraggins*, 192 Mont. at 12, 625 P.2d at 1153. It spoke exclusively of the parties' agreement concerning the Mint Bar and made no mention of the Diablo Mobile Repair business. Nevertheless, the district court allowed parol evidence of an earlier agreement between the parties concerning the Diablo Mobile Repair business to alter and vary the terms of the written contract concerning the Mint Bar. We held this was error, noting that none of the exceptions to the parol evidence rule applied. With respect to § 1-4-102, we stated that "[w]hen the contract is clear and unequivocal on its face, section 1-4-102, MCA, does not apply." *Spraggins*, 192 Mont. at 12, 625 P.2d at 1153 (citing *Ryan v. Ald, Inc.*, 146 Mont. 299, 406 P.2d 373 (1965)). This statement is consistent with the principle that surrounding circumstances may not be considered once the court has determined that the instrument is unambiguous. Thus, *Spraggins* comports with our clarifications of § 1-4-102 above.

¶58 The written contract at issue in *Payne* gave Payne the exclusive right to sell property owned by Buechler. It also provided that Buechler would pay Payne the 10%

commission if Buechler sold the property herself or withdrew Payne's authority under the contract prior to the stated expiration date. *Payne*, 192 Mont. at 312-13, 628 P.2d at 647. Following a bench trial, the district court found that Buechler had not intended to grant Payne the exclusive right to sell the property. This finding was based on testimony by Buechler that she did not intend to give Payne an exclusive listing and that she had previously given listings to other agencies which were still in effect at the time she entered into the contract with Payne. On appeal, Buechler argued that the district court had properly admitted this testimony pursuant to § 1-4-102. We disagreed, observing that the language of the parties' contract was "plain and unambiguous" and that, under such circumstances, "the language alone controls and there is nothing for the Court to interpret or construe." *Payne*, 192 Mont. at 317, 628 P.2d at 650.

¶59 As in *Spraggins*, this statement is consistent with the principle that surrounding circumstances may not be considered once the court has determined that the instrument is unambiguous. However, our subsequent statement that § 1-4-102 "only applies where an ambiguity exists in the language of the contract," *Payne*, 192 Mont. at 317, 628 P.2d at 650, was overbroad. As explained above, § 1-4-102 also applies to aid the court in determining whether an ambiguity exists in the first place, and our statement in *Payne* that the statute "only applies where an ambiguity exists in the language of the contract," which was correct on the facts of that case, should not be read as precluding this additional purpose of § 1-4-102.[6]

---

[6] The same is true of the similar statements in *Ryan*, 146 Mont. at 303, 406 P.2d at 375 (stating that R.C.M. 1947, § 93-401-17 (now § 1-4-102, MCA) "is applicable only

¶60    Next, parol evidence abounded in the briefs and in the record before this Court in *Yellowstone II* due to the inherent complications of the case.  *See Yellowstone II*, ¶ 36.  Yet, the documents at issue in the case were not ambiguous.  *Yellowstone II*, ¶ 35.  Thus, we clarified that we would disregard the parol evidence in the briefs and the record:

> While we may properly consider evidence of the circumstances under which the agreement was made, *see*, *e.g.*, *Weinberg v. Farmers State Bank of Worden* (1988), 231 Mont. 10, 24, 752 P.2d 719, 728; § 28-2-905, MCA, we will not consider evidence presented *for the singular purpose* of establishing that a contract includes supplemental promises or mutual understandings or conditions of performance that were never incorporated into a written agreement that by its own terms purports to represent the entire agreement between the parties.  [Citations to §§ 28-2-904 and 70-20-202, MCA.]
>
> Suffice to say, this Court must therefore disregard all attempts by Yellowstone II to establish that, in addition to the express, unambiguous terms of the written agreement, the "contract" should include additional parol promises or representations or mutual understandings allegedly made by the parties prior to and at the time of formation . . . .

*Yellowstone II*, ¶¶ 36-37 (emphasis added).  These statements are merely applications of the parol evidence rule, §§ 28-2-904 and -905(1), MCA.

¶61    Cenex points out that we also stated:  "Determining whether a term in a contract is ambiguous . . . is not a question involving parol evidence, but merely one of law concerning interpretation and potential use of extrinsic evidence."  *Yellowstone II*, ¶ 35 (citing *In re Marriage of Holloway*, 2000 MT 104, ¶ 5, 299 Mont. 291, ¶ 5, 999 P.2d 980, ¶ 5, and § 1-4-102, MCA).  Our use of the term "parol evidence" in this sentence, however, must be understood in the context of the discussion in ¶¶ 35-37 of *Yellowstone*

---

when the instrument requires construction"), and *First Nat. Bank of Plains v. Green Mountain Soil Con. Dist.*, 130 Mont. 1, 5, 293 P.2d 289, 291 (1956) (stating that R.C.M. 1947, § 93-401-17 "allows the circumstances under which a contract was made to be shown only for the proper construction of the instrument").

*II.* The documents at issue were unambiguous; and the point of the discussion in ¶¶ 35-37, therefore, was to clarify that we would not consider evidence presented by Yellowstone II of additional parol promises or representations or mutual understandings allegedly made by the parties prior to and at the time the documents were executed. Thus, our statement that "[d]etermining whether a term in a contract is ambiguous . . . is not a question involving parol evidence," *Yellowstone II*, ¶ 35, stands for the unremarkable proposition that subjective evidence of prior or contemporaneous oral promises may not be considered for the purpose of determining whether the contract contains an ambiguity. Nevertheless, to the extent that this statement might be understood to conflict with our clarifications above concerning the applicability of § 1-4-102, MCA, it is overruled.

¶62 Lastly, *Tester* concerned a boundary dispute in Bridger Canyon, just north of Bozeman, Montana (hereinafter, "Section 17"). Two roads of public record ran through Section 17 in a north-south direction: the 1891 County Road and the 1948 State Highway. *Tester*, ¶ 3. Throughout the plaintiffs' chain of title, there were many inconsistencies, including the unclear use of the terms "public road" and "country road" in reference to the boundary between plaintiffs' and defendants' respective properties in Section 17. *Tester*, ¶ 16. The key point of confusion, however, regarded language in a 1951 deed by which James Funk conveyed all that part of Section 17 " 'lying East of the old County Road as existing over and across said Section prior to the year 1950.' " *Tester*, ¶¶ 16, 17. The plaintiffs claimed that the terms "public road" and "country road" in the deeds in their chain of title were references to the "traveled way," which became

the State Highway, and that Funk, therefore, had intended the State Highway, and not the Country Road, to be the boundary. The defendants, however, contended that if Funk had intended to transfer all land east of the State Highway, he would have used the words " 'all land lying East of the State Highway.' " *Tester*, ¶¶ 13, 22.

¶63 Applying § 1-4-102, we concluded that the defendants were correct:

> The plain language of the Funk deed is unambiguous. An unambiguous deed must be interpreted according to its language as written, without resort to extrinsic evidence of the grantor's intent. For proper construction of an instrument § 1-4-102, MCA, allows us to examine the "circumstances under which it was made, including the situation of the subject of the instrument and of the parties to it." The record indicates that the County Road was the only official road in the Section from 1891 to 1948 and was recorded as being in its original location until the State Highway was constructed in 1948.
> . . . .
> If Funk intended to convey east of the State Highway which was constructed only three years earlier, he certainly could have done so. Instead, he explicitly conveyed east of the old County Road. To conclude that Funk's language is ambiguous and that he really meant to convey east of the State Highway would be to read an intent into his language which is simply not justified.
> We conclude that based on the unambiguous language of the deed, and the circumstances under which it was made, including the plats of Section 17, and the State Highway records, the District Court's conclusion that the State Highway is the legal boundary between the properties was incorrect.

*Tester*, ¶¶ 25-28 (citation omitted).

¶64 This application of § 1-4-102 illustrates the use of extrinsic evidence for the purpose of determining, as a preliminary matter, whether the language in question is ambiguous. The crucial question was whether "the old County Road as existing over and across said Section prior to the year 1950" was susceptible to at least two reasonable but conflicting meanings. We considered the objective surrounding circumstances—namely,

36

the plats of Section 17, the State Highway records, and the fact that at the time Funk executed the deed (in 1951), the County Road had existed since 1891 and the State Highway had existed since 1948—and we decided that the language was unambiguous.[7]

¶65 Our analysis in *Tester* also illustrates the important distinction between *Donnell* and *Taylor*, *supra*. "Instruments are to be interpreted according to their subject-matter, and parol evidence may be resorted to in order to ascertain the nature and qualities of the subject to which the instrument refers." *Donnell*, 1 Mont. at 526. Thus, it was appropriate in *Tester* to consider parol evidence in order to ascertain the subject to which "the old County Road as existing over and across said Section prior to the year 1950" referred. But while circumstances and surroundings may aid the language, they may not destroy it. "They can apply the deed to its proper subject, and when thus applied, the language must describe such subject, and be entirely consistent with it." *Taylor*, 1 Mont. at 699. The plaintiffs' evidence of Funk's intent to convey "the State Highway" was entirely inconsistent with the language "old County Road" in the deed. Thus, such evidence should not have been considered by the district court.

¶66 We conclude, therefore, that *Tester* also comports with our clarifications of § 1-4-102 herein.

---

[7] In this regard, Cenex cites *Olson v. Jude*, 2003 MT 186, ¶ 47, 316 Mont. 438, ¶ 47, 73 P.3d 809, ¶ 47, *DeNiro v. Gasvoda*, 1999 MT 129, ¶ 29, 294 Mont. 478, ¶ 29, 982 P.2d 1002, ¶ 29, *In re Estate of Kuralt*, 1999 MT 111, ¶ 30, 294 Mont. 354, ¶ 30, 981 P.2d 771, ¶ 30, and *Downs v. Smyk*, 200 Mont. 334, 346, 651 P.2d 1238, 1244 (1982), for the proposition that "[t]his Court has consistently applied § 1-4-102, MCA, *only* where there has been ambiguity or uncertainty with respect to an instrument" (emphasis added). Given our analysis in *Tester*, however, Cenex's assertion is incorrect. Nevertheless, we note that *Olson*, *DeNiro*, *Kuralt*, and *Downs* are consistent with the foregoing clarifications of the applicability of § 1-4-102, MCA.

## C. Application of § 1-4-102, MCA, to the Right-of-Way Agreements

¶67 Turning now to the right-of-way agreements, the District Court reasoned that § 1-4-102 did not apply in this case "[b]ecause the Easements are unambiguous." To the extent the District Court understood § 1-4-102, MCA, as precluding it from considering objective evidence of the circumstances under which the right-of-way agreements were made for the purpose of determining, as a preliminary matter, whether the agreements contained an ambiguity, the court erred for the reasons set forth above.

¶68 Nevertheless, the Landowners' leading argument (in both the District Court and this Court) is that the granting language is unambiguous, and Cenex agrees with the Landowners on this point. Accordingly, in this situation, where the parties concede that the language in question is unambiguous, § 1-4-102 does not apply. *See* ¶ 47, *supra*. On this basis, therefore, we hold that the District Court did not err in refusing to consider the circumstances under which the right-of-way agreements were made.

¶69 *Issue 4. Did the District Court err in determining that the granting language is unambiguous?*

¶70 As a backup position, the Landowners argue (as they did in the District Court) that the granting language is ambiguous. The Landowners first point out that they and Cenex have offered "two distinct readings of the Easement granting language," which in their view "establishes the ambiguity of the granting language." We reject this argument outright. As stated above, "a conclusion of ambiguity is not compelled by the fact that the parties to a document, or their attorneys, have or suggest opposing interpretations of a contract, or even disagree as to whether the contract is reasonably open to just one

38

interpretation." Richard A. Lord, *Williston on Contracts* vol. 11, § 30:4, at 51-54 (4th ed., West 1999) (footnotes omitted); *accord Holmstrom v. Mutual Benefit Health & Accident Ass'n*, 139 Mont. 426, 428, 364 P.2d 1065, 1066 (1961) ("Ambiguity does not exist just because a claimant says so."); *Heggem v. Capitol Indem. Corp.*, 2007 MT 74, ¶ 30, 336 Mont. 429, ¶ 30, 154 P.3d 1189, ¶ 30 ("[A] mere disagreement over the meaning of an insurance provision does not render the provision ambiguous.").

¶71 The Landowners next argue that " '[t]ogether with' and 'in connection with' easily can be considered synonymous by reasonable people. Thus, reasonable people could interpret the Easement granting language differently." We have already rejected this argument. The term "together with," as used in the granting language, is not reasonably susceptible to the meaning "in connection with." *See* ¶ 27, *supra*.

¶72 The Landowners also present three "circumstances" under which the easements were granted. We will examine these circumstances to determine, as a preliminary matter, whether they demonstrate the existence of an ambiguity in the granting language.

¶73 First, the Landowners contend that they were told by Cenex's agents that the fiber optic cable would be used only to operate and monitor the pipeline. Second, and in a similar vein (but framed as a separate "circumstance"), the Landowners state:

> The Landowners never contemplated that a transcontinental communications network would be running across their land. They certainly had no idea that tens, if not hundreds, of third-party companies would use the Easements to transmit General Telecommunications. The Landowners also had no idea that repair trucks from tens, if not hundreds, of different companies could come onto their land to regenerate the light and maintain, repair, and splice the [Indefeasible Rights of Use].

39

These two circumstances, however, do not demonstrate the existence of an ambiguity in the granting language. As explained above, testimony of the parties as to what they believe the language in question means—i.e., subjective evidence of ambiguity—"is invariably self-serving, inherently difficult to verify and thus, inadmissible." *Home Ins. Co.*, 56 F.3d at 768. Thus, these two circumstances may not be considered here. But even if this subjective evidence could be considered, the granting language is not susceptible to the meaning the Landowners advocate here based on what Cenex's agents allegedly told them and how the Landowners "contemplated" the fiber optic cable would be used. To conclude that the granting language provides that "the fiber optic cable may be used only to operate and monitor the pipeline" would be to insert language into the right-of-way agreements—something we may not do. *See* § 1-4-101, MCA; *see also Corn Exchange*, 175 A. at 58 ("So far as the [proffered] evidence tends to show, not the meaning of the writing, but an intention wholly unexpressed in the writing, it is irrelevant."). These two circumstances, therefore, do not establish that the granting language is ambiguous.[8]

---

[8] It is important to clarify here that our reasoning is specific to the question of whether the Landowners' proffered "circumstances" establish an ambiguity in the granting language, not the question of whether the right-of-way agreements are valid in the first place. The Landowners' briefs are peppered with assertions that the agreements were procured by Cenex using "deceit" and "threat" and that the Landowners were "duped." Yet, their Complaint did not set forth a claim challenging the validity or accuracy of the agreements. *See, e.g.*, § 28-2-1711(1), MCA (providing that a party to a contract may rescind the same if the party's consent was given by mistake or obtained through duress, menace, fraud, or undue influence). Rather, the Landowners sought only to enforce their interpretations of the agreements. To do so, however, they may not use extrinsic evidence of prior oral agreements to explain the meaning of, or to add words to, otherwise unambiguous granting language. *See* §§ 28-2-904 and -905(1), MCA.

¶74 Third, the Landowners assert that Cenex "threatened" condemnation in order to secure the right-of-way agreements. The Landowners maintain that the granting language, therefore, "was intended to convey only that which would be authorized by statute if Cenex exercised its power of eminent domain. The language Cenex chose [in drafting the right-of-way agreements] only can be interpreted to conform to, and be in compliance with, § 69-13-103(1), MCA." Section 69-13-103(1), MCA, provides:

> The right to lay, maintain, and operate pipelines, together with telegraph and telephone lines *incidental to and designed for use only in connection with the operation of such lines*, or along, across, or under any public stream or highway in this state is hereby conferred upon all persons, firms, limited partnerships, joint-stock associations, or corporations coming within any of the definitions of common carrier pipelines as hereinbefore made. [Emphasis added.]

However, even assuming, *arguendo*, that Cenex used "the threat of condemnation" to secure the easements, this circumstance does not render the granting language susceptible to at least two reasonable but conflicting meanings. Rather, it seems that the Landowners would have us simply insert the words "incidental to and designed for use only in connection with the operation of such lines" into the granting language immediately following "a buried fiber optic communications cable." Again, this we may not do. *See* § 1-4-101, MCA.

¶75 In sum, the Landowners have not shown that an ambiguity exists in the right-of-way agreements. The three circumstances proffered by the Landowners, even when they are considered collectively, do not demonstrate that the granting language is susceptible to at least two reasonable but conflicting meanings. Accordingly, we hold that the District Court did not err in concluding that the granting language is unambiguous.

41

¶76    *Issue 5.  Did the District Court err in determining that there is no genuine issue as to any material fact?*

¶77    The Landowners' final "alternative" argument is that there are genuine issues of material fact precluding summary judgment for either side.  The Landowners cite *Proctor v. Werk*, 220 Mont. 246, 250, 714 P.2d 171, 173 (1986), in which this Court stated that "[s]ummary judgment is usually inappropriate where the intent of the contracting parties is an important consideration" (internal quotation marks omitted).  Cenex agrees that if we determine that extrinsic evidence is necessary to determine the parties' intent in entering into the right-of-way agreements, then summary judgment is not appropriate.  However, they maintain that the disputed language of the right-of-way agreements is unambiguous and, thus, that there are no genuine issues of material fact.  We agree with Cenex.

¶78    The Landowners' argument that there are genuine issues of material fact precluding summary judgment is premised on the theory that the language of the right-of-way agreements is ambiguous; however, we concluded under Issue 4 that the disputed language is not ambiguous, and we perceive no other genuine issues of material fact.  "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible."  Section 28-3-303, MCA.  "The language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity."  Section 28-3-401, MCA.  Here, the disputed language of the right-of-way agreements is clear and explicit and is not alleged to involve an absurdity.  Furthermore, it is possible to ascertain the intention of the parties from that language

42

alone. The language provides that the Landowners grant Cenex "the right to construct, maintain, inspect, operate, protect, repair, replace, change the size of or remove a pipeline or pipelines or other appurtenances, for the transportation of oil, liquids and/or gases and the products thereof, together with a buried fiber optic communications cable." Cenex's use of the fiber optic cable is not restricted by these words to operating and monitoring the pipeline. To the extent that the Landowners intended such a meaning or understood the language as providing for such a meaning, that intent simply is not expressed in the right-of-way agreements, the validity of which the Landowners have not challenged (*see* ¶ 73 n.8, *supra*).

¶79 Given that the granting language is unambiguous, the District Court's duty was to apply that language as written. *Ophus*, ¶ 23; *Carelli*, 279 Mont. at 209, 926 P.2d at 761. The court did so and determined that the right-of-way agreements (1) grant Cenex an easement to bury a fiber optic cable on the Landowners' properties, (2) does not limit the use of the fiber optic cable to operating and monitoring the pipeline, and (3) gives Cenex the right to assign any of its rights, in whole or in part, to any third party. Accordingly, the court concluded that Cenex was not in breach of the right-of-way agreements and that Cenex was entitled to judgment as a matter of law. We agree with this conclusion and, thus, affirm the District Court's judgment granting Cenex's motion for summary judgment and denying the Landowners' motion for partial summary judgment. Further, given this conclusion, we agree with the District Court's decision to deny as moot the Landowners' motion for class certification.

**CONCLUSION**

¶80     Pursuant to § 1-4-102, MCA, objective evidence of "the circumstances under which [an instrument] was made, including the situation of the subject of the instrument and of the parties to it," may be shown and considered for the purpose of aiding the court in determining, as a preliminary matter, whether the instrument contains an ambiguity. The District Court erred to the extent it understood § 1-4-102 as precluding consideration of such evidence.  However, the surrounding circumstances proffered by the Landowners in this case do not demonstrate that the granting language is ambiguous.  Thus, the District Court ultimately reached the correct conclusion that the granting language of the right-of-way agreements is unambiguous.  "We affirm district court decisions which are correct regardless of the court's reasoning in reaching the decision."  *Clark v. Eagle Systems, Inc.*, 279 Mont. 279, 286, 927 P.2d 995, 999 (1996); *accord In re Marriage of Rolf*, 2003 MT 194, ¶ 41, 316 Mont. 517, ¶ 41, 75 P.3d 770, ¶ 41 ("[W]e will affirm a district court's decision when it reaches the correct result for the wrong reasons." (internal quotation marks omitted)).

¶81     Because the granting language is unambiguous, the District Court was not required to interpret that language in the light most favorable to the Landowners.  Likewise, the court properly refused at this point to consider surrounding circumstances for the purpose of applying the granting language.  Lastly, the court correctly determined that the term "together with," as used in the granting language, does not unambiguously limit Cenex's use of the fiber optic cable to operating and monitoring the pipeline.  In light of this determination, the District Court did not err in granting Cenex's motion for summary

44

judgment and denying the Landowners' motion for partial summary judgment and motion for class certification.

¶82    Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ PATRICIA COTTER
/S/ JOHN WARNER
/S/ JIM RICE
/S/ BRIAN MORRIS